**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

T-MOBILE USA INC., a Delaware
corporation; et al.,
      *Plaintiffs-Appellees,*

v.

CITY OF ANACORTES, a Washington
municipal corporation,
      *Defendant-Appellant.*

No. 08-35493

D.C. No.
2:07-cv-01644-RAJ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
June 1, 2009—Seattle, Washington

Filed July 20, 2009

Before: William C. Canby, Jr., David R. Thompson and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

9205

COUNSEL

Dan S. Lossing of Inslee, Best, Doezie & Ryder, P.S. of Bellevue, Washington, for the defendant-appellant.

T. Scott Thompson (argued) of Davis Wright Tremaine, LLP of Washington, D.C., and Linda Atkins of Bellevue, Washington, for the plaintiffs-appellees.

OPINION

CALLAHAN, Circuit Judge:

The City of Anacortes (the "City") appeals the district court's determination that the City's denial of an application by T-Mobile USA, Inc. ("T-Mobile") to erect a 116-foot monopole antenna at a particular location violates a provision of the Telecommunications Act of 1996, 47 U.S.C.

§ 332(c)(7)(B). The district court found that T-Mobile's proposal was the least intrusive means to close a significant gap in its wireless service in the City, and that the City's denial was not supported by substantial evidence. We determine that, although the district court did not have the benefit of our opinion in *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc) ("*Sprint II*"), and therefore failed to recognize that the City's denial of the application was supported by substantial evidence, the district court nevertheless properly concluded that the City's denial of the application violated § 332(c)(7)(B) because the City failed to rebut T-Mobile's showing that the denial of the application amounted to an effective prohibition of wireless services.

## I.

T-Mobile offers digital wireless voice, messaging and data services. It provides its services through a cellular radio telephone network which is comprised of thousands of cell antenna sites, switching facilities and other network elements. The federal government assigns radio frequency ("RF") channels to each wireless carrier and the RF channels are assigned to the cell sites to enable wireless communications. The district court noted: "[t]he limited number of RF channels must be reused at different cell sites, creating potential interference between sites. To minimize such interference, all sites transmit at very low power, resulting in limited coverage from each site. The location of antenna sites is determined by terrain, structure blockage, call volume, and antenna height."

In September 2006, in order to close a "service gap" and to expand its coverage in the City, T-Mobile applied for a permit to construct an additional wireless telecommunications facility ("WCF") at a particular site: 2201 "H" Avenue, which is owned by the United Methodist Church (sometimes referred to as the "Church site"). The permit application analyzed eighteen site alternatives and proposed the construction of a 116-foot monopole with three antennas at the top.

The Anacortes Municipal Code ("AMC") regulates the permitting approval process. T-Mobile's application was for a "special use permit" ("SUP").[1] The AMC also provides that installation of a tower or antenna without a permit is a misdemeanor.

The City Planning Commission eventually denied the application, and T-Mobile appealed to the City Council. The City Council held a hearing on the matter and following the meeting, voted to deny the application. On September 19, 2007, the City Council entered written findings of fact and conclusions of law denying the application.

On the basis of the testimony of witnesses and other evidence before the City Planning Commission and City Council, the City's written findings and conclusions explained that:

> The proposed wireless communications facility would have a commercial appearance and would detract from the residential character and appearance of the surrounding neighborhood. The proposed wireless communications facility would not be compatible with the character and appearance of the

---

[1]The AMC sets forth eight factors the City must consider when deciding whether to grant a SUP:

1. the height of the proposed tower,

2. the proximity of the tower to residential structures and district boundaries,

3. the nature of uses on adjacent and nearby properties,

4. the surrounding topography,

5. the surrounding tree coverage and foliage,

6. the design of the tower (with emphasis on features that reduce or eliminate visual obtrusiveness),

7. proposed ingress and egress, and

8. the availability of alternatives not requiring a tower.

existing development in the vicinity of 2201 "H" Avenue, which is predominantly single-family residences. The proposed wireless communications facility would negatively impact the views from single-family residences in the vicinity of the proposed site.

The City further stated that the predominant land use in the vicinity of the proposed site was residential and that the "existing vegetation would not completely screen the proposed tower and the tower would be taller than the existing trees."

The City also concluded that "T-Mobile has not established that its proposal to locate a wireless communications facility tower at the 2201 'H' Avenue site is the 'least intrusive' on the values that the denial of the application seeks to serve." It determined:

At least four alternative single sites are potentially acceptable to provide coverage as required by T-Mobile, and at least two two-site alternatives would work from an RF coverage perspective. These alternative sites are either on commercially or industrially zoned property, or would provide a site for [a] proposed wireless communications facility that is not in such close proximity to residences. T-Mobile also offers an in-home service technology that provides another alternative for "in-structure" cellular telephone service. If T-Mobile constructed a wireless communications facility at one or more of the alternate single sites or two-site alternatives, a significant gap in T-Mobile's service coverage would no longer exist, even though that coverage would not be identical to that provided by a tower at the 2201 "H" Avenue site.

## II.

On October 10, 2007, T-Mobile filed a complaint for declaratory and injunctive relief in the District Court for the

Western District of Washington, alleging violations of sections 253 and 332 of the Telecommunications Act ("TCA"), 47 U.S.C. §§ 253 and 332(c)(7)(B). The parties filed cross-motions for summary judgment, and at a hearing held on April 25, 2008, agreed that no material facts were in dispute that might prevent the court from ruling on the respective motions.

On May 6, 2008, the district court granted T-Mobile summary judgment on its claim that the AMC, as it related to T-Mobile's wireless communications facility, was preempted by 47 U.S.C. § 253. The district court based its ruling on the Ninth Circuit's opinion in *Sprint Telephony PCS, L.P. v. County of San Diego*, 490 F.3d 700 (9th Cir. 2007) ("*Sprint I*").[2] The district court ordered the City to issue a permit allowing T-Mobile to construct the monopole. It also noted that in light of its resolution of the § 253 preemption issue, it did not need to address the parties' arguments concerning § 332(c)(7).

Shortly after the district court's order, we agreed to rehear *Sprint I* en banc. The City then asked the district court to reconsider its order and to grant a stay of enforcement pending the resolution of the en banc proceedings in *Sprint I*. T-Mobile opposed the City's requests and also asked the district court to rule on its claims under § 332.

On July 18, 2008, the district court denied the City's requests for relief and ruled in favor of T-Mobile on its request for relief under § 332. The district court held:

---

[2]The district court reasoned:

The county ordinance challenged in *Sprint* [*I*] contains similar provisions to the AMC provisions challenged in this case. Both add voluminous submission requirements to a multi-layer permitting process, both contain criminal penalties for non-compliance, and both include subjective aesthetic and design requirements that vest significant discretion in the decision-making body.

T-Mobile has shown that its proposal was the "least intrusive" means to close the significant gap, based on its good-faith effort to identify less-intrusive alternatives. The City's conclusion to the contrary was not supported by substantial evidence. Because the City prevented T-Mobile from closing a significant service gap through the "least intrusive" means available, the City's decision has the effect of prohibiting wireless service in violation of Section 332(c)(7).

On September 11, 2008, we issued our en banc opinion in *Sprint II*. The en banc panel disagreed with *Sprint I* and with the court's prior opinion in *City of Auburn v. Qwest Corp.*, 260 F.3d 1160 (9th Cir. 2001), and joined "the Eighth Circuit in holding that 'a plaintiff suing a municipality under section 253(a) must show actual or effective prohibition, rather than the mere possibility of prohibition.' " 543 F.3d at 578 (quoting *Level 3 Commc'ns, L.L.C. v. City of St. Louis*, 477 F.3d 528, 532 (8th Cir. 2007)).

The parties then stipulated that *Sprint II* was controlling as to T-Mobile's claim under § 253, and agreed that the portion of the appeal concerning § 253 could be remanded to the district court to allow T-Mobile to withdraw its claim under § 253. We issued an order effectuating the parties' stipulation. Thus, only the district court's grant of relief to T-Mobile pursuant to 47 U.S.C. § 332 remains pending before us.

## III.

Resolution of this appeal requires some appreciation of the purposes behind the Telecommunications Act of 1996, Pub. L. No 104-104, 110 Stat. 56, (codified as amend in scattered sections of U.S.C., Tabs 15, 18, 47), and our efforts to discern and effectuate those purposes. When enacting the TCA, Congress expressed two sometimes contradictory purposes. First, it expressed its intent "to promote competition and reduce

regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." 110 Stat. at 56. In *Sprint II*, we noted that Congress chose to "end the States' longstanding practice of granting and maintaining local exchange monopolies" and that it did so by enacting 47 U.S.C. § 253.[3] 543 F.3d at 576 (internal punctuation and citations omitted).

---

[3]Section 253 reads, in relevant part:

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

(e) Commercial mobile service providers

Nothing in this section shall affect the application of section 332(c)(3) of this title to commercial mobile service providers.

Second, Congress was determined "to preserve the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement." *Sprint II*, 543 F.3d at 576 (internal punctuation and citations omitted). This legislative purpose was reflected in the enactment of 47 U.S.C. § 332(c)(7).[4]

---

[4]Subsection 332(c)(7) reads:

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, **nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities**.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) **shall not prohibit or have the effect of prohibiting the provision of personal wireless services**.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) **Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record**.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facili-

"Section 332(c)(7)(A) preserves the authority of local governments over zoning decisions regarding the placement and construction of wireless service facilities, subject to enumerated limitations in § 332(c)(7)(B). One such limitation is that local regulations "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." *Sprint II*, 543 F.3d at 576.

In *MetroPCS, Inc. v. City of San Francisco*, 400 F.3d 715 (9th Cir. 2005), we considered the requirement in § 332(c) that a local zoning decision be "supported by substantial evidence." *Id.* at 723-26 (discussing 47 U.S.C. § 332(c)(7)(B)(iii)). We noted that although the term "substantial evidence" was not defined in the TCA, there appeared to be "universal agreement among the circuits as to the substantive content of this requirement" — "this language is meant to trigger 'the traditional standard used for judicial review of agency decisions.' " *Id.* at 723 (internal citation omitted). Furthermore, "the substantial evidence inquiry does not require incorporation of the substantive federal standards imposed by the TCA, but instead requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*." *Id.* at 723-24. "In other words, we must take applicable state and local regulations as we find them and evaluate the City

ties comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

(emphasis added).

decision's evidentiary support (or lack thereof) relative to those regulations. If the decision fails that test it, of course, is invalid even before the application of the TCA's federal standards." *Id.* at 724. We commented that this approach "enables us to avoid unnecessarily reaching the federal questions of whether a zoning decision violates the substantive provisions of the TCA," and noted that "in most cases, only when a locality applies the regulation to a particular permit application and reaches a decision — which it supports with substantial evidence — can a court determine whether the TCA has been violated." *Id.*

*Sprint II* concerned a facial challenge to a local zoning ordinance under § 253 of the TCA. 543 F.3d at 574. The en banc court generally agreed with the standards set forth in *MetroPCS*, and in doing so moved away from the more "procedural" standard we had endorsed in *Sprint I* and *Auburn*.[5] It overruled *Auburn* and joined "the Eighth Circuit in holding that 'a plaintiff suing a municipality under section 253(a) must show actual or effective prohibition, rather than the mere possibility of prohibition.' " *Sprint II*, 543 F.3d at 578 (quoting *Level 3 Commc'ns*, 477 F.3d at 532).

The en banc court noted that its approach to § 253 was "buttressed" by our interpretation of § 332(c). *Id.* It explained that in "*MetroPCS*, to construe § 332(c)(7)(B)(i)(II), we focused on the *actual* effects of the city's ordinance, not on what effects the ordinance *might possibly* allow." *Id.* The en banc court concluded:

> Our holding today therefore harmonizes our interpretations of the identical relevant text in §§ 253(a) and

---

[5]In *Auburn*, we held that the municipal regulations at issue "were preempted because they imposed procedural requirements, charged fees, authorized civil and criminal penalties, and — 'the ultimate cudgel'— reserved discretion to the city to grant, deny, or revoke the telecommunications franchises." 543 F.3d at 577 (internal citation omitted).

332(c)(7)(B)(i)(II). **Under both**, **a plaintiff must establish** either an outright prohibition or **an effective prohibition on the provision of telecommunications services**; a plaintiff 's showing that a locality could *potentially* prohibit the provision of telecommunications services is insufficient.

*Id*. at 579 (footnote omitted) (emphasis added).

Although *Sprint II* concerned a facial challenge to a local ordinance pursuant to § 253, its statements as to what a plaintiff service provider had to show provide guidance for our resolution of this as-applied challenge to the City's denial of a permit pursuant to § 332. For instance, we noted:

A certain level of discretion is involved in evaluating any application for a zoning permit. It is certainly true that a zoning board *could* exercise its discretion to effectively prohibit the provision of wireless services, but it is equally true (and more likely) that a zoning board would exercise its discretion only to balance the competing goals of an ordinance — the provision of wireless services and other valid public goals such as safety and aesthetics.

543 F.3d at 580. We also noted that the plaintiff had "not identified a single requirement that effectively prohibits it from providing wireless services," commenting that "[o]n the face of the Ordinance, requiring a certain amount of camouflage, modest setbacks, and maintenance of the facility are reasonable and responsible conditions for the construction of wireless facilities, not an effective prohibition."[6] *Id*.

---

[6]We also gave several examples of what restrictions could be facially challenged.

If an ordinance required, for instance, that all facilities be underground and the plaintiff introduced evidence that, to operate,

**IV.**

With the benefit of our en banc opinion in *Sprint II*, we review the district court's order holding that the City's denial of the permit violates § 332(c). We review the district court's grant of summary judgment *de novo*. *MetroPCS*, 400 F.3d at 720. Moreover, as suggested in *MetroPCS*, we first consider whether the City's denial under the AMC is supported by substantial evidence. *Id.* at 724. Determining that the denial is supported by substantial evidence under the applicable local laws, we then consider whether the denial violates § 332(c). We conclude that because the City failed to adequately rebut T-Mobile's prima facie showing that no other location was available and feasible, the district court properly found that the denial of the permit constituted an effective prohibition of coverage.

**A.    The City's denial of the application was supported by substantial evidence.**

[1] The AMC provides that when considering a special use permit, the City may consider a number of factors including the height of the proposed tower, the proximity of the tower to residential structures, the nature of uses on adjacent and nearby properties, the surrounding topography, and the surrounding tree coverage and foliage.[7] We, and other courts, have held that these are legitimate concerns for a locality.

--------

wireless facilities must be above ground, the ordinance would effectively prohibit it from providing services. Or, if an ordinance mandated that no wireless facilities be located within one mile of a road, a plaintiff could show that, because of the number and location of roads, the rule constituted an effective prohibition.

543 F.3d at 580.

[7] The AMC also provides for consideration of "the availability of alternatives not requiring a tower." The record does not indicate that any such alternatives existed.

*Sprint II*, 543 F.3d at 580 (stating that the zoning board may consider "other valid public goals such as safety and aesthetics"); *see also T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County, Kan.*, 546 F.3d 1299, 1312 (10th Cir. 2008) (noting that "aesthetics can be a valid ground for local zoning decisions"); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (recognizing that "aesthetic concerns can be a valid basis for zoning decisions"); *Voice Stream PCS I, LLC v. City of Hillsboro*, 301 F. Supp. 2d 1251, 1255 (D. Or. 2004).[8]

**[2]** There was substantial evidence concerning these factors. A number of residents claimed that the monopole would have a detrimental impact on the surrounding residential property, that the pole would not be completely screened, and that it would interfere with residents' views of the Cascade Mountains and other scenic views. This evidence is "more than a scintilla of evidence," and accordingly the district court should have deferred to the City's determination that the evidence was adequate to support its denial of the application under the AMC. *See MetroPCS*, 400 F.3d at 725 (stating that "this Court may not overturn the Board's decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence").

**B.    The City did not rebut T-Mobile's showing that the**

---

[8]In *Voice Stream*, the district court observed:

> [u]nder the TCA, the board is entitled to make an aesthetic judgment as long as the judgment is "grounded in the specifics of the case," and does not evince merely an aesthetic opposition to cellphone towers in general. . . . Accordingly, when the evidence specifically focuses on the adverse visual impact of the tower at the *particular location at issue* more than a mere scintilla of evidence generally will exist.

301 F. Supp. 2d at 1258 (internal citations omitted).

**denial of the application constituted an effective prohibition of services**.

1. *Under the least intrusive means standard, the provider has the burden of showing the lack of available and technologically feasible alternatives.*

**[3]** In *MetroPCS*, we recognized that a locality could violate the TCA's effective prohibition clause if it prevented a wireless provider from closing a "significant gap" in service coverage. 400 F.3d at 731. Such a claim generally "involves a two-pronged analysis requiring (1) the showing of a "significant gap" in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations." *Id.* Here, the City concedes that there is a "significant gap" in T-Mobile's services in Anacortes.[9] Once the provider has demonstrated the requisite gap, the issue becomes what showing a provider must make in support of its proposed means of closing the gap. *Id.* at 734.

**[4]** In *MetroPCS*, we adopted the "least intrusive means" standard used by the Second and Third Circuit. 400 F.3d at 734 (citing *ATP Pittsburgh, L.P. v. Penn Twp.*, 196 F.3d 469, 480 (3d Cir. 1999); *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 398 (3d Cir. 2003); *Nextel West Corp. v. Unity Twp.*, 282 F.3d 257, 266 (3d Cir. 2002); and *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 642 (2d Cir. 1999)). This standard requires that the provider "show that the manner in which it proposes to fill the significant gap in services is the *least intrusive on the values that the denial sought to serve*." *MetroPCS*, 400 F.3d at 734 (internal quotation marks and citation omitted). We noted that this standard:

---

[9]In *MetroPCS*, we "formally adopt[ed] the First Circuit's rule that a significant gap in service (and thus an effective prohibition of service) exists whenever a provider is prevented from filling a significant gap in *its own* service coverage." 400 F.3d at 733.

allows for a meaningful comparison of alternative sites before the siting application process is needlessly repeated. It also gives providers an incentive to choose the least intrusive site in their first siting applications, and it promises to ultimately identify the best solution for the community, not merely the last one remaining after a series of application denials.

*Id*. at 734-35. Our opinion in *MetroPCS* concluded by instructing the district court to apply the "least intrusive means" standard "in its consideration of the prohibition issue on remand." *Id*.

Here, T-Mobile, cognizant of the "least intrusive means" standard, submitted a detailed permit application that included an analysis of eighteen alternative sites. The City nonetheless denied the permit, concluding that the Church site was not the least intrusive means of closing the gap.

**[5]** Where, as here, there is more than a scintilla of evidence to support a locality's disapproval of a particular site for a WCF, a court's determination of whether the denial violates the TCA turns on an evaluation of the availability and technological feasibility of the alternatives. We read *MetroPCS* and *Sprint II* as holding that the provider has the burden of showing the lack of available and technologically feasible alternatives.[10] *See Sprint II*, 543 F.3d at 579; *MetroPCS*, 400 F.3d at 734.

---

[10]The Third Circuit appears to agree. It noted:

the provider applicant must also show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve. This will require a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc.

*Penn Twp.*, 196 F.3d at 480.

2. *The City failed to rebut T-Mobile's showing of a lack of available and feasible alternative sites.*

**[6]** In determining whether T-Mobile met its burden of demonstrating that the Church site was the "least intrusive means," we examine the City's stated ground for concluding otherwise. The City's findings and conclusions stated:

> At least four alternative single sites are potentially acceptable to provide coverage as required by T-Mobile, and at least two two-site alternatives would work from an RF coverage perspective. These alternative sites are either on commercially or industrially zoned property, or would provide a site for proposed wireless communications facility that is not in such close proximity to residences. T-Mobile also offers an in-home service technology that provides another alternative for "in-structure" cellular telephoneservice. If T-Mobile constructed a wireless communications facility at one or more of the alternate single sites or two-site alternatives, a significant gap in T-Mobile's service coverage would no longer exist, even though that coverage would not be identical to that provided by a tower at the 2201 "H" Avenue site.

Initially, we agree with the district court that T-Mobile's in-home service technology (HotSpot@Home) is not relevant to a determination of the least intrusive means. This service is not a global system for mobile communications ("GSM"), must be separately purchased by individual customers, requires a broadband Internet connection, and only works within the homes of subscribing customers. Accordingly, the availability of HotSpot@Home has no effect on the significant gap in T-Mobile's cell phone coverage of Anacortes, which it offers in competition with other cell phone service providers.

We next consider the adequacy and technological feasibility of the six alternatives advanced by the City. The City's consultant noted four single antenna alternatives: (1) Anacortes Middle School, (2) Anacortes Police Headquarters, (3) Washington National Guard Building, and (4) Island View Elementary School. However, the consultant noted that these alternatives "are all lower in ground elevation, would require at least the same antenna height and would have somewhat lower signal levels in the resident areas that are at the northern and western portions of T-Mobile's coverage area of interest." The consultant also found two two-site combinations that "could work from an RF coverage perspective . . . a combination of the city water tank at the end of 29th St . . . with either the Whitney Elementary School (12th St & M Ave) or the Guemes Island communications tower." He noted that use of the Guemes Island communications tower "would have the advantage of improving T-Mobile's coverage along Oakes Avenue and the San Juan Islands ferry docking." However, he also commented that a "two-site solution may not be feasible because it would require two sites be constructed instead of one, which would raise both the impact of the WCF's on the community as well as the construction and operational costs that T-Mobile would have to bear."[11] The consultant concluded that "T-Mobile has chosen the best possible location . . . to improve the radio coverage of their PCS GSM network and that few, if any, viable alternative locations exist for T-Mobile in vicinity of their proposed location."

T-Mobile did not rest on the consultant's equivocal report, but presented the City with evidence showing that most, if not all, of the possible alternative sites were not available. T-Mobile told the Planning Commission that the Police Chief had said that an antenna adjacent to the police headquarters

---

[11]The consultant further noted that "[e]ach site would have to have a sufficiently large coverage footprint to generate enough traffic to pay back the wireless carrier's investment in the site as well as to defray the ongoing expenses to operate the site."

would never be approved "due to the proximity to the hospital across the street and the flight patterns of emergency helicopters," and because a tall antenna "would meet with great resistence due to the views from the west looking east and the lack of trees in the area to screen a taller pole." T-Mobile also asserts that because the National Guard site is next to the police station, these concerns preclude the placement of an antenna there.

Moreover, it is questionable whether any public school site was available. T-Mobile's first choice for the location of a WCF was Anacortes High School. It entered into negotiations with the school district, but the school district declined its proposal. The City argues, however, that during the application process, the school district indicated that it would consider allowing T-Mobile's facility at the high school, and that T-Mobile improperly declined to pursue this option asserting that it came too late in the process. T-Mobile responds that because the school district had multiple grounds for declining its initial offer, further negotiations with the school district were not likely to be fruitful.

Finally, T-Mobile asserts that the two-site combinations are not feasible because "there is no evidence on the record indicating that T-Mobile would have access to or be approved to use the 'Guemes Island' site." It further asserts that Guemes Island "is within the jurisdiction of Skagit County, and the City has no jurisdiction to determine whether a facility there would be permitted."

[7] The issue then is whether the City's claim that school sites and Guemes Island are available is sufficient to allow it to decline T-Mobile's proposal. We approach this issue by applying the standard set forth in *Sprint II*. We must determine whether T-Mobile has shown "an effective prohibition on the provision of telecommunications services," or only that the denial of its application "could *potentially* prohibit the provision of telecommunications services." *Sprint II*, 543 F.3d

at 579. Furthermore, the determination should be made in a manner that allows "for a meaningful comparison of alternative sites before the siting application is needlessly repeated," and "gives providers an incentive to choose the least intrusive site in their first siting applications." *MetroPCS*, 400 F.3d at 735.

**[8]** As we have previously indicated, the provider has the burden of showing that the denial of its proposal will effectively prohibit the provision of services. *Sprint II*, 543 F.3d at 579. A provider makes a prima facie showing of effective prohibition by submitting a comprehensive application, which includes consideration of alternatives, showing that the proposed WCF is the least intrusive means of filing a significant gap. A locality is not compelled to accept the provider's representations. However, when a locality rejects a prima facie showing, it must show that there are some potentially available and technologically feasible alternatives. The provider should then have an opportunity to dispute the availability and feasibility of the alternatives favored by the locality.

**[9]** Here, the City has failed to show that there are any available alternatives. The possibility of locating a WCF at the high school or any other public school in Anacortes is too speculative to be considered a viable alternative. In declining to entertain T-Mobile's proposal to locate the WCF at the high school, the school district cited three reasons: "upsetting our neighbors, allowing T-Mobile total 24/7 access to our high school site, [and] committing the property to this particular 'long term' project." It is by no means clear that an increase in compensation by T-Mobile would overcome any of these concerns. In light of the opposition to the Church site, and T-Mobile's experience in other localities,[12] no school site

---

[12]T-Mobile presented testimony to the Planning Commission that it had approached thousands of school boards about locating WCFs on their properties, and that where there is opposition in the community to the construction of a WCF, such opposition is likely to be intensified if the proposed location of the WCF is on school property.

appeared to be sufficiently available to support the denial of T-Mobile's Church site application in favor of forcing T-Mobile to pursue a new application with the school district in order to close the significant gap in its coverage.

**[10]** The alternative of the combination of the city water tank and the Guemes Island communication tower presents a closer question. The City offered to allow T-Mobile access to the water tank free of charge, and T-Mobile did not really deny that it could use the Guemes Island communications tower.[13] Accordingly, unlike the other alternatives, this combination may have been viable. However, in light of the environmental impact and additional costs identified by the City's own consultant as being inherent in the two-site combination, as well as the City's failure to present any evidence concerning the availability of the Guemes Island communications tower, we do not think that the possible viability of this combination defeats T-Mobile's showing that the Church site is the least intrusive means of closing its significant gap.[14] We conclude that T-Mobile made a prima facie showing that placing its WCF on the Church site was the least intrusive means of closing its significant gap in service coverage and that the City's denial of the application without showing the existence of some potentially available and technically feasible alternative constituted an effective prohibition of service, which the district court properly enjoined.

Because we conclude that the City failed to show that there were any available alternative sites, we need not determine whether the proposed alternative sites would have provided

---

[13]The fact that the communications tower is not within the City of Anacortes does not appear to be relevant to the question of whether the site is available.

[14]Because of our determination that the City failed to show that the Guemes Island communications tower was available, we need not consider T-Mobile's claim that the two-site combination would not close the significant gap in its service.

sufficient coverage to close the gap in T-Mobile's coverage. We would address this issue in the same manner as we addressed the availability of alternative sites. The provider's application would have to show how the proposed site would close the gap, supported by data showing the coverage afforded by other sites. The locality could then investigate and determine whether the provider's representations were sound and persuasive. The provider would then have an opportunity to reply to the locality's challenges.

Indeed, this is how T-Mobile and the City proceeded in this case. T-Mobile supported its application with considerable data showing the coverage of the Church site and the other alternatives. The City responded by questioning some of T-Mobile's data and arguing that T-Mobile's propagation maps did not delineate the coverages offered by the alternatives when combined with T-Mobile's existing WCFs. The resolution of this disagreement over the adequacy of the propagation maps and the potential coverage of alternative sites is not necessary because we have determined that the City failed to show that any alternative sites were available.

**[11]** In sum, applying our statement in *Sprint II* that a plaintiff must establish "an effective prohibition on the provision of telecommunications services," 543 F.3d at 579, we conclude that T-Mobile's application made a prima facie showing of effective prohibition, and that the City in denying the application failed to show that there were any potentially available and feasible alternatives to the Church site. Accordingly, the City's denial of T-Mobile's application violates 47 U.S.C. § 332(c)(7)(B)(i)(II).

## V.

The TCA requires that courts, when reviewing a locality's denial of an application to a wireless communications facility, balance local concerns over the specific locations of such facilities with the national purpose of providing telecommuni-

cation services to all consumers. Following the procedure we set out in *MetroPCS*, 400 F.3d at 724, we first considered whether there was substantial evidence to support the City's denial of the special use permit under the applicable state and local laws. Because we concluded that there was substantial evidence to support the denial under the AMC, we then considered whether the denial violates 47 U.S.C. § 332(c)(7)(B)(i)(II) by prohibiting or having the effect of prohibiting the provision of personal wireless services. *See Sprint II*, 543 F.3d at 579. T-Mobile made a prima facie showing that its proposed location was the least intrusive means to close the admitted significant gap in coverage by including in its application an analysis of eighteen alternative sites. Although the City was not required to accept the provider's representations, in order to avoid violating § 332(c)(7)(B), the City was required to show the existence of some potentially available and technologically feasible alternative to the proposed location. Because the City has failed to do so, the district court's grant of summary judgment in favor of T-Mobile is **AFFIRMED.**