**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SPRINT PCS ASSETS, L.L.C., a
Delaware limited liability
company, wholly-owned by Sprint
Telephony PCS, LP, a Delaware
limited partnership,
                            *Plaintiff-Appellee,*

                v.

CITY OF PALOS VERDES ESTATES, a
California municipality; CITY
COUNCIL OF THE CITY OF PALOS
VERDES ESTATES, its governing
body; JOSEPH SHERWOOD, in his         No. 05-56106
official capacity as Mayor Pro           D.C. No.
Tem of the City of Palos Verdes       CV-03-00825-AHS
Estates; JOHN FLOOD, in his official
capacity as Councilmember of the        OPINION
City of Palos Verdes Estates;
ROSEMARY HUMPHREY, in her
official capacity as
Councilmember of the City of
Palos Verdes Estates; DWIGHT
ABBOTT, in his official capacity as
Councilmember of the City of
Palos Verdes Estates; JAMES F.
GOODHART, in his official capacity
as Councilmember of the City of
Palos Verdes Estates,
                            *Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

14535

Argued and Submitted
July 6, 2009—Pasadena, California

Filed October 14, 2009

Before: Barry G. Silverman, Kim McLane Wardlaw, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

Scott J. Grossberg, Richard R. Clouse, Amy R. von Kelsch-Berk, and Angelica A. Arias of Cihigoyenetche, Grossberg & Clouse, Ranco Cucamonga, California, and Daniel P. Barer of Pollak, Vida & Fisher, Los Angeles, California, for the appellants.

John J. Flynn III, Gregory W. Sanders, and Michael W. Shonafelt of Nossaman, Guthner, Knox & Elliott, LLP, Irvine, California, for the appellee.

**OPINION**

WARDLAW, Circuit Judge:

The City of Palos Verdes Estates ("City") appeals the grant of summary judgment in favor of Sprint PCS Assets, L.L.C. ("Sprint"). We must decide whether the district court erred in concluding that the City violated the Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in various sections of U.S.C. titles 15, 18, and 47), when it denied Sprint permission to construct two wireless telecommunications facilities in the City's public rights-of-way. Specifically, we must decide (1) whether the City's denial is supported by substantial evidence, as required by 47 U.S.C. § 332(c)(7)(B)(iii), and (2) whether the City's denial constitutes a prohibition on the provision of wireless service in violation of 47 U.S.C. §§ 253(a) and 332(c)(7)(B)(i)(II). Because the City's denial is supported by substantial evidence, and because disputed issues of material fact preclude a finding that the decision amounted to a prohibition on the provision of wireless service, we reverse and remand.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The City is a planned community, about a quarter of which consists of public rights-of-way that were designed not only to serve the City's transportation needs, but also to contribute to its aesthetic appeal. In 2002 and 2003, Sprint applied for permits to construct wireless telecommunications facilities ("WCF") in the City's public rights-of-way. The City granted eight permit applications but denied two others, which are at issue in this appeal. One of the proposed WCFs would be constructed on Via Azalea, a narrow residential street, and the other would be constructed on Via Valmonte, one of the four main entrances to the City. Sprint acknowledged that it already served four thousand customers in the City with its existing network but stated that the proposed WCFs were nonetheless needed to replace its existing infrastructure.

A City ordinance ("Ordinance") provides that WCF permit applications may be denied for "adverse aesthetic impacts arising from the proposed time, place, and manner of use of the public property." Palos Verdes Estates, Cal., Ordinances ch. 18.55.040(B)(1). Under the Ordinance, the City's Public Works Director ("Director") denied Sprint's WCF permit applications, concluding that the proposed WCFs were not in keeping with the City's aesthetics. The City Planning Commission affirmed the Director's decision in a unanimous vote.

Sprint appealed to the City Council ("Council"), which received into evidence a written staff report that detailed the potential aesthetic impact of the proposed WCFs and summarized the results of a "drive test," which confirmed that cellular service from Sprint was already available in relevant locations in the City. The Council also heard public comments and a presentation from Sprint's representatives. The Council issued a resolution affirming the denial of Sprint's permit applications. It concluded that a WCF on Via Azalea would disrupt the residential ambiance of the neighborhood and that a WCF on Via Valmonte would detract from the natural beauty that was valued at that main entrance to the City.

Denied permits by the Director, the Commission, and the Council, Sprint took its case to federal court, seeking a declaration that the City's decision violated various provisions of the TCA. The district court concluded that the City's decision was not supported by substantial evidence and thus violated 47 U.S.C. § 332(c)(7)(B)(iii). This determination was premised on a legal conclusion that California law prohibits the City from basing its decision on aesthetic considerations. The district court also concluded that the City violated 47 U.S.C. §§ 253 and 332(c)(7)(B)(i)(II) by unlawfully prohibiting the provision of telecommunications service, finding that the City had prevented Sprint from closing a significant gap in its coverage. The City timely appeals.

## II.   JURISDICTION AND STANDARD OF REVIEW

The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review summary judgment de novo." *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) (citation omitted). Summary judgment is appropriate only if the pleadings, the discovery, disclosure materials on file, and affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). All justifiable factual inferences must be drawn in the City's favor, and we must reverse the grant of summary judgment if any rational trier of fact could resolve a material factual issue in the City's favor. *See Nelson*, 571 F.3d at 927.

## III.   DISCUSSION

The tension between technological advancement and community aesthetics is nothing new. In an 1889 book that would become a classic in city planning literature, Vienna's Camillo Sitte lamented:

> [T]here still remains the question as to whether it is really necessary to purchase these [technological] advantages at the tremendous price of abandoning all artistic beauty in the layout of cities. The innate conflict between the picturesque and the practical cannot be eliminated merely by talking about it; it will always be present as something intrinsic to the very nature of things.

Camillo Sitte, City Planning According to Artistic Principles 110 (Rudolph Wittkower ed., Random House 1965) (1889).

The TCA attempts to reconcile this "innate conflict." On the one hand, the statute is intended to "encourage the rapid deployment of new telecommunications technologies." Pub.

L. No. 104-104, 110 Stat. 56. On the other hand, it seeks "to preserve the authority of State and local governments over zoning and land use matters." *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 992 (9th Cir. 2009) (citation omitted). The TCA seeks a balance by placing certain limitations on localities' control over the construction and modification of WCFs. *See* 47 U.S.C. §§ 253(a), 332(c)(7)(B). This appeal involves a challenge to the district court's conclusion that the City exceeded those limitations.

## A.    Section 332(c)(7)(B)(iii)

**[1]** One of the limitations that the TCA places upon local governments is that "[a]ny decision . . . to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). As we have explained, "The upshot is simple: this Court may not overturn the [City's] decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence." *MetroPCS, Inc. v. City & County of S.F.*, 400 F.3d 715, 725 (9th Cir. 2005).[1] Thus, we must determine (1) whether the City's decision was authorized by local law and, if it was, (2) whether it was supported by a reasonable amount of evidence. Both requirements are satisfied here.

### 1.    *The City's decision was authorized by local law.*

"[W]e must take applicable state and local regulations as we find them and evaluate the City decision's evidentiary

---

[1]The district court did not have the benefit of our decision in *MetroPCS* when it issued its order granting Sprint summary judgment on its claims under 47 U.S.C. §§ 253 and 332(c)(7)(B)(iii). Indeed, there has been considerable development in this area of the law since the district court resolved Sprint's motion. *See, e.g., Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008); *City of Anacortes*, 572 F.3d at 987.

support (or lack thereof) relative to those regulations." *MetroPCS*, 400 F.3d at 724. As noted above, the Ordinance authorizes the denial of WCF permit applications on aesthetic grounds. Also relevant for our purposes is the California Public Utilities Code ("PUC"), which provides telecommunications companies with a right to construct WCFs "in such manner and at such points as not to incommode the public use of the road or highway," Cal. Pub. Util. Code § 7901, and states that "municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed." *Id.* § 7901.1. The district court erred in concluding that the City's consideration of aesthetics was invalid under the PUC.[2] The California Constitution gives the City the authority to regulate local aesthetics, and neither PUC § 7901 nor PUC § 7901.1 divests it of that authority.

---

[2]During the pendency of this appeal, pursuant to Cal. R. Ct. 8.548(a), we requested that the California Supreme Court decide whether PUC §§ 7901 and 7901.1 permit public entities to regulate the placement of telephone equipment in public rights-of-way on aesthetic grounds. The California Supreme Court denied our request, concluding that a decision on that issue may not be determinative in these federal proceedings. Accordingly, the task now before us is to predict how the California Supreme Court would resolve the issue. *See Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007). We may look to the state's intermediate appellate courts for guidance. *Id.* While the question of whether California's municipalities have the power to consider aesthetics in deciding whether to grant WCF permit applications has been addressed by us and the California Courts of Appeals, it has not been resolved in a published opinion on which we may rely. *See Sprint PCS Assets, L.L.C. v. City of La Cañada Flintridge*, 182 Fed. Appx. 688, 690-91 (9th Cir. 2006) (city may not consider aesthetics); *Sprint Telephony PCS v. County of San Diego*, 44 Cal. Rptr. 3d 754, 764-66 (Cal. Ct. App. 2006) (city may consider aesthetics) *superseded by* 143 P.3d 654 (Cal. 2006); *see also* 9th Cir. R. 36-3 (unpublished dispositions are not precedent); Cal. R. Ct. 8.1115 (no citation or reliance on unpublished opinions).

### i.    *California's Constitution*

**[2]** The California Constitution authorizes local governments to "make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const. art. XI, § 7. California's Supreme Court has explained that a " 'city's police power under this provision can be applied only within its own territory and is subject to displacement by general state law but otherwise is as broad as the police power exercisable by the Legislature itself.' " *Fisher v. City of Berkeley*, 693 P.2d 261, 271 (Cal. 1984) (quoting *Birkenfeld v. City of Berkeley*, 550 P.2d 1001, 1009 (Cal. 1976)); *see also Conn. Indem. Co. v. Super. Ct. of San Joaquin County*, 3 P.3d 868, 872 (Cal. 2000) (state constitution provides city with "general authority to exercise broad police powers"). There is no question that the City's authority to regulate aesthetics is contained within this broad constitutional grant of power. *See Landgate, Inc. v. Cal. Coastal Comm'n*, 953 P.2d 1188, 1198 (Cal. 1998) (aesthetic preservation is "unquestionably [a] legitimate government purpose[ ]"); *Ehrlich v. City of Culver City*, 911 P.2d 429, 450 (Cal. 1996) ("[A]esthetic conditions have long been held to be valid exercises of the city's traditional police power.").

Thus, the threshold issue is not, as Sprint argues and the district court apparently believed, whether the PUC authorizes the City to consider aesthetics in deciding whether to grant a WCF permit application, but is instead whether the PUC divests the City of its constitutional power to do so.[3] There-

---

[3]Sprint urges us to approach the question differently, relying on language from *Western Union Tel. Co. v. Hopkins*, 116 P. 557 (Cal. 1911), that

> [i]t is universally recognized that the state in its sovereign capacity has the original right to control all public streets and highways, and that except in so far as that control is relinquished to municipalities by the state, either by provision of the state consti-

fore, the question actually before us is whether the City's consideration of aesthetics is "in conflict with general laws." Cal. Const. art. XI, § 7. "A conflict exists if the local legislation duplicates, contradicts, or enters an area fully occupied by . . . legislative implication." *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 163 P.3d 89, 96 (Cal. 2007) (citation and quotation omitted). "Local legislation is contradictory to general law when it is inimical thereto." *Id.* (citation and quotation omitted). Absent a specific legislative indication to the contrary, we presume that there is no conflict where the local government regulates an area over which it has traditionally exercised control. *See id.* Sprint has the burden of demonstrating that a conflict exists. *See id.* We conclude that neither PUC § 7901 nor PUC § 7901.1 conflicts with the City's default power to deny a WCF permit application for aesthetic reasons.

### ii.    PUC § 7901

**[3]** The City's consideration of aesthetics in denying Sprint's WCF permit applications comports with PUC § 7901,

---

tution or by legislative act not inconsistent with the Constitution, it remains with the state legislature.

*Id.* at 562. The defect in Sprint's argument is that it contemplates a relinquishment of state sovereignty through statute only, thus turning a blind eye to the constitutional grant of power contained in Cal. Const. art. XI, § 7. Our observation that the City possesses constitutionally based police powers over aesthetics is entirely consistent with the *Hopkins* court's recognition that the utility companies' right to construct telegraph facilities remained subject to "the lawful exercise by the city of such rights in regard to such use as it has under the police power." *Hopkins*, 116 P. at 563; *see also id.* at 562 (city retains power to do "such things in regard to the streets and the use thereof as were justified in the legitimate exercise of the police power"); *see also Pac. Tel. & Tel. Co. v. City & County of S.F.*, 336 P.2d 514, 519 (Cal. 1959) (telephone franchise is a matter of state concern but city still controls the particular location and manner in which public utility facilities are constructed in the streets). The *Hopkins* court refrained from articulating the scope of the city's police powers because, unlike in this appeal, that was "a question in no way involved in [the] case." *Hopkins*, 116 P. at 562-63.

which provides telecommunications companies with a right to construct WCFs "in such manner and at such points as not to incommode the public use of the road or highway." Cal. Pub. Util. Code § 7901. To "incommode" the public use is to "subject [it] to inconvenience or discomfort; to trouble, annoy, molest, embarrass, inconvenience" or "[t]o affect with inconvenience, to hinder, impede, obstruct (an action, etc.)." 7 The Oxford English Dictionary 806 (2d ed. 1989); *see also* Webster's New Collegiate Dictionary 610 (9th ed. 1983) ("To give inconvenience or distress to."). The experience of traveling along a picturesque street is different from the experience of traveling through the shadows of a WCF, and we see nothing exceptional in the City's determination that the former is less discomforting, less troubling, less annoying, and less distressing than the latter. After all, travel is often as much about the journey as it is about the destination.

The absence of a conflict between the City's consideration of aesthetics and PUC § 7901 becomes even more apparent when one recognizes that the "public use" of the rights-of-way is not limited to travel. It is a widely accepted principle of urban planning that streets may be employed to serve important social, expressive, and aesthetic functions. *See* Ray Gindroz, *City Life and New Urbanism*, 29 Fordham Urb. L.J. 1419, 1428 (2002) ("A primary task of all urban architecture and landscape design is the physical definition of streets and public spaces as places of shared use."); Kevin Lynch, The Image of the City 4 (1960) ("A vivid and integrated physical setting, capable of producing a sharp image, plays a social role as well. It can furnish the raw material for the symbols and collective memories of group communication."); Camillo Sitte, City Planning According to Artistic Principles 111-12 (Rudolph Wittkower ed., Random House 1965) (1889) ("One must keep in mind that city planning in particular must allow full and complete participation to art, because it is this type of artistic endeavor, above all, that affects formatively every day and every hour of the great mass of the population . . . ."). As Congress and the California Legislature have recognized,

the "public use" of the roads might also encompass recreational functions. *See, e.g.*, Cal. Pub. Util. Code § 320 (burying of power lines along scenic highways); 23 U.S.C. § 131(a) (regulation of billboards near highways necessary "to promote . . . recreational value of public travel . . . and to preserve natural beauty").

These urban planning principles are applied in the City, where the public rights-of-way are the visual fabric from which neighborhoods are made. For example, the City's staff report explains that Via Valmonte, which is adorned with an historic stone wall and borders a park, is "cherished for its rural character, and valued for its natural, unspoiled appearance, rich with native vegetation." Meanwhile, Via Azalea is described as "an attractive streetscape" that creates a residential ambiance. That the "public use" of these rights-of-way encompasses more than just transit is perhaps most apparent from residents' letters to the Director, which explained that they "moved to Palos Verdes for its [a]esthetics" and that they "count on this city to protect [its] unique beauty with the abundance of trees, the absence of sidewalks, even the lack of street lighting."

**[4]** Thus, there is no conflict between the City's consideration of aesthetics in deciding to deny a WCF permit application and PUC § 7901's statement that telecommunications companies may construct WCFs that do not incommode the public use of the rights-of-way.

### iii.    PUC § 7901.1

**[5]** Nor does the City's consideration of aesthetics conflict with PUC § 7901.1's statement that "municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed." Cal. Pub. Util. Code § 7901.1. That provision was added to the PUC in 1995 to "bolster the cities' abilities with regard to construction management and to send a message to

telephone corporations that cities have authority to manage their construction, without jeopardizing the telephone corporations' statewide franchise." S. Comm. on Energy, Utilities, and Commerce, Analysis of S.B. 621, Reg. Sess., at 5728 (Cal. 1995); *see also id.* ("[I]ntent of this bill is to provide the cities with some control over their streets.").[4] If the preexisting language of PUC § 7901 did not divest cities of the authority to consider aesthetics in denying WCF construction permits, then, a fortiori, neither does the langauge of PUC § 7901.1, which only "bolsters" cities' control.

[6] Aesthetic regulations are "time, place, and manner" regulations,[5] and the California Legislature's use of the phrase "are accessed" in PUC § 7901.1 does not change that conclusion in this context. Sprint argues that the "time, place and manner" in which the rights-of-way "are accessed" can refer only to when, where, and how telecommunications service providers gain entry to the public rights-of-way. We do not disagree. However, a company can "access" a city's rights-of-way in both aesthetically benign and aesthetically offensive ways. It is certainly within a city's authority to permit the former and not the latter.[6]

---

[4]We cite the legislative history only to put the statute in its historical context; we do not rely upon it to discern the statute's meaning.

[5]In the First Amendment context, California courts have recognized that governments' aesthetic-based regulations fall within the rubric of "time, place, and manner" regulations. *See, e.g.*, *Showing Animals Respect & Kindness v. City of W. Hollywood*, 83 Cal. Rptr. 3d 134, 141 (Ct. App. 2008) (ordinance with declared purpose of improving city aesthetics was valid time, place, and manner regulation); *Union of Needletrades, AFL-CIO v. Super. Ct. of L.A. County*, 65 Cal. Rptr. 2d 838, 850-51 (Ct. App. 1997) (requirement that leaflets comport with mall's general aesthetics constituted valid time, place, and manner regulation). We see no principled basis on which to distinguish aesthetic "time, place, and manner" regulations in the First Amendment context from aesthetic "time, place, and manner" regulations in the context of PUC § 7901.1.

[6]Our conclusion that the language of PUC § 7901.1 does not conflict with the City's consideration of aesthetics in denying WCF permit appli-

**[7]** Our interpretation of California law is consistent with the outcome in *City of Anacortes*, in which we rejected a § 332(c)(7)(B)(iii) challenge to a city's denial of a WCF permit application that was based on many of the same aesthetic considerations at issue here. *City of Anacortes*, 572 F.3d at 994-95. There, the city determined that the proposed WCF would have "a commercial appearance and would detract from the residential character and appearance of the surrounding neighborhood"; that it "would not be compatible with the character and appearance of the existing development"; and that it would "negatively impact the views" of residents. *Id.* at 989-90. We noted that the city ordinance governing permit applications required the city to consider such factors as the height of the tower and its proximity to residential structures, the nature of uses of nearby properties, the surrounding topography, and the surrounding tree coverage and foliage. *Id.* at 994. We stated that "[w]e, and other courts, have held that these are legitimate concerns for a locality." *Id.* (citing *T-Mobile Cent., LLC v. United Gov't of Wyandotte County, Kan. City*, 546 F.3d 1299, 1312 (10th Cir. 2008); *Cellular*

---

cations is supported by the California Legislature's use of materially identical language in the California Coastal Act, which provides that:

> The public access policies of this article shall be implemented in a manner that takes into account the need to regulate the time, place, and manner of public access depending on the facts and circumstances in each case including, but not limited to . . . [t]he need to provide for the management of access areas so as to protect . . . the aesthetic values of the area by providing for the collection of litter.

Cal. Pub. Res. Code § 30214(a)(4). If Sprint's narrow interpretation of PUC § 7901.1 were correct, it would follow that, in the California Coastal Act, the Legislature explicitly stated that the need to regulate the time, place, and manner of access depends on the need to protect aesthetic values, but that, in PUC § 7901.1, the Legislature meant to say that control over the time, place, and manner of access excluded control over aesthetics. We see no reason to ascribe this inconsistency to the California Legislature, however.

*Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)). What was implicit in our decision in *City of Anacortes* we make explicit now: California law does not prohibit local governments from taking into account aesthetic considerations in deciding whether to permit the development of WCFs within their jurisdictions.

Sprint warns that this conclusion will allow municipalities to run roughshod over WCF permit applications simply by invoking aesthetic concerns. However, our decision in no way relieves municipalities of the constraints imposed upon them by the TCA. A city that invokes aesthetics as a basis for a WCF permit denial is required to produce substantial evidence to support its decision, and, even if it makes that showing, its decision is nevertheless invalid if it operates as a prohibition on the provision of wireless service in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). Nor does our decision constitute a judgment on the merits of the City's decision in this case. Our function is not to determine whether the City's denial of Sprint's permit applications was a proper weighing of all the benefits (e.g., economic opportunities, improved service, public safety) and costs (e.g., the ability of residents to enjoy their community) of the proposal, but is instead to determine whether the City violated any provision of the TCA in so doing.

### 2.  *The City's decision was supported by such relevant evidence that a reasonable mind might accept as adequate.*

**[8]** "[W]hile the term 'substantial evidence' is not statutorily defined in the Act, the legislative history of the TCA explicitly states, and courts have accordingly held, that this language is meant to trigger 'the traditional standard used for judicial review of agency decisions.' " *MetroPCS*, 400 F.3d at 723 (quoting H.R. Conf. Rep. No. 104-458, at 208 (1996)). A municipality's decision that is valid under local law will be upheld under the TCA's "substantial evidence" requirement

where it is supported by " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* at 725 (quoting *Town of Oyster Bay*, 166 F.3d at 494).

[9] The City's finding that the proposed WCFs would adversely affect its aesthetic makeup easily satisfies this standard. The Council reviewed propagation maps and mock-ups of the proposed WCFs and a report that detailed the aesthetic values at stake. It had the benefit of public comments and an oral presentation from Sprint's personnel. From the entirety of the evidence, one could reasonably determine, as the City did, that the Via Azalea WCF would detract from the residential character of the neighborhood and that the Via Valmonte WCF would not be in keeping with the appearance of that main entrance to the City. Consequently, we find that the City's decision was supported by substantial evidence, and we reverse the district court.

## B.   Section 332(c)(7)(B)(i)(II)

[10] The TCA provides that a locality's denial of a WCF permit application "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). "[A] locality can run afoul of the TCA's 'effective prohibition' clause if it prevents a wireless provider from closing a 'significant gap' in service coverage." *MetroPCS*, 400 F.3d at 731.[7] The "effective prohibition" inquiry "involves a two-pronged analysis requiring (1) the showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations."[8] *Id.* at 731. Because we conclude that Sprint has

[7]We focus on the "effective prohibition" clause because the City has not adopted a "general ban" on wireless services. *See MetroPCS*, 400 F.3d at 731. To the contrary, the City's ordinance contemplates the construction of WCFs, and the City has repeatedly granted permits for WCF construction in the past.

[8]We have adopted the "multiple provider rule," which focuses the "significant gap" inquiry on the issue of whether a particular provider is pre-

not shown the existence of a significant gap as a matter of law, we do not reach the second element of the analysis.

The district court's legal conclusion that Sprint established the existence of a "significant gap" rests on two purportedly undisputed facts: (1) "[w]ithout either facility, [Sprint's] network will contain significant gaps in coverage" and (2) existing wireless coverage in the City was "based on obsolete facilities needing replacement." These factual findings were insufficient to support summary judgment because they were disputed in the record below.

### 1.   *Significance of the Gap*

" '[S]ignificant gap' determinations are extremely fact-specific inquiries that defy any bright-line legal rule." *Id.* at 733. Yet Sprint and the district court take a bare-bones approach to this inquiry. The district court simply declared, as a matter of fact and fiat, that there was "a significant gap" in Sprint's coverage in the City. Sprint defends this factual finding on appeal, arguing that its presentation of radio frequency propagation maps was sufficient to establish a "significant gap" in coverage. We disagree.

Sprint's documentation stated that the proposed WCFs would provide "good coverage" for .2 to .4 miles in various directions. However, it remains far from clear whether these estimates were relative to the coverage available from existing WCFs or to the coverage that would be available if there were no WCFs at all (i.e., if the existing WCFs were removed). In any event, that there was a "gap" in coverage is certainly not sufficient to establish that there was a "significant gap" in coverage. *See id.* at 733 n.10 ("[T]he relevant service gap

---

vented from filling a significant gap in its own service coverage; the availability of wireless service from other providers in the area is irrelevant for purposes of this analysis. *MetroPCS*, 400 F.3d at 733.

must be truly 'significant . . . .' "); *id.* at 733 ("The TCA does not guarantee wireless service providers coverage free of small 'dead spots . . . .' ").

**[11]** The district court found that there was a "gap" in Sprint's coverage but failed to analyze its legal significance. District courts have considered a wide range of context-specific factors in assessing the significance of alleged gaps. *See, e.g., Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 70 n.2 (3d Cir. 1999) (whether gap affected significant commuter highway or railway); *Powertel/Atlanta, Inc. v. City of Clarkston*, No. 1:05-CV-3068, 2007 WL 2258720, at *6 (N.D. Ga. Aug. 3, 2007) (assessing the "nature and character of that area or the number of potential users in that area who may be affected by the alleged lack of service"); *Voice Stream PCS I, LLC v. City of Hillsboro*, 301 F. Supp. 2d 1251, 1261 (D. Or. 2004) (whether facilities were needed to improve weak signals or to fill a complete void in coverage); *Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y. 2003) (gap covers well traveled roads on which customers lack roaming capabilities); *Am. Cellular Network Co., LLC v. Upper Dublin Twp.*, 203 F. Supp. 2d 383, 390-91 (E.D. Pa. 2002) (considering "drive tests"); *Sprint Spectrum, L.P. v. Town of Ogunquit*, 175 F. Supp. 2d 77, 90 (D. Me. 2001) (whether gap affects commercial district); *APT Minneapolis, Inc. v. Stillwater Twp.*, No. 00-2500, 2001 WL 1640069, at *2-3 (D. Minn. June 22, 2001) (whether gap poses public safety risk). Here, the district court said nothing about the gap from which it could have determined its relative significance (i.e., whether preventing its closure was tantamount to a prohibition on telecommunications service), nor did Sprint's counsel offer any support for a conclusion that the gap was significant.[9]

---

[9]During oral argument, Sprint's counsel was unable to explain satisfactorily on what basis the district court found that the gap was significant. He acknowledged that there was a dispute as to the significance of the gap in Sprint's coverage within the City, and he even conceded that he had seen nothing in the record that led him to believe that the matter was uncontested.

### 2.    *Obsolescence of Existing WCF Network*

We need not decide whether the TCA's anti-prohibition language even covers situations, like that presented here, in which a telecommunications service provider seeks to replace existing WCFs, as contrasted with the more typical situation in which the provider seeks to construct new WCFs. It is sufficient to note that the record does not establish the obsolescence of the old facilities as a matter of uncontested fact. Sprint's representatives not only failed to explain why the existing facilities were no longer usable, but they actually undermined that position by pointing out that those facilities were currently serving some four thousand residents and acknowledging at the public hearing that Sprint service was generally available in the City. Residents' comments at the public hearing and the drive test results contained in the staff report submitted to the Council further illustrate that Sprint's existing network was, at the very least, functional. Consequently, we reverse the grant of summary judgment in Sprint's favor on its § 332(c)(7)(B)(i)(II) "effective prohibition" claim.

## C.    Section 253

The district court also concluded that the City's ordinance was "preempted by the Supremacy Clause, insofar as it conflicts with section 253(a) of the Telecom Act." However, due to intervening changes in the law, this Supremacy Clause claim is no longer viable. *See Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 578 (9th Cir. 2008) (en banc) (overruling *City of Auburn v. Qwest Corp.*, 260 F.3d 1160 (9th Cir. 2001), and holding that "a plaintiff suing a municipality under section 253(a) must show actual or effective prohibition, rather than the mere possibility of prohibition" (citation omitted)); *see also City of Anacortes*, 572 F.3d at 993. Moreover, we need not decide whether § 253 contemplates "as applied" challenges. Insofar as Sprint seeks to advance an "as applied" challenge under § 253, we conclude,

for the reasons set forth above, that Sprint has not demonstrated a prohibition on the provision of wireless service as a matter of law. *See Sprint Telephony*, 543 F.3d at 579 ("We need not decide whether Sprint's suit falls under § 253 or § 332. As we now hold, the legal standard is the same under either.").

## IV.   CONCLUSION

**[12]** Because the City's decision to deny Sprint's application for a permit to construct two new WCFs was supported by substantial evidence and because disputed issues of material fact preclude a finding that the decision constituted a prohibition on the provision of wireless service, we **REVERSE and REMAND.**