**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICAN TOWER CORPORATION, a Delaware corporation, <br> *Plaintiff-Appellee*, <br><br> v. <br><br> CITY OF SAN DIEGO; CITY COUNCIL OF THE CITY OF SAN DIEGO; DEVELOPMENT SERVICES DEPARTMENT OF THE CITY OF SAN DIEGO, <br> *Defendants-Appellants*. | No. 11-56766 <br><br> D.C. No. 3:07-cv-00399- BEN-WVG |

| | |
|---|---|
| AMERICAN TOWER CORPORATION, a Delaware corporation, <br> *Plaintiff-Appellee*, <br><br> v. <br><br> CITY OF SAN DIEGO, <br> *Defendant-Appellant*, <br><br> and <br><br> CITY COUNCIL OF THE CITY OF SAN DIEGO; DEVELOPMENT SERVICES DEPARTMENT OF THE CITY OF SAN DIEGO, <br> *Defendants*. | No. 11-56767 <br><br> D.C. No. 3:07-cv-00399- BEN-WVG |

| | |
|---|---|
| AMERICAN TOWER CORPORATION, a Delaware corporation, *Plaintiff-Appellant*, v. CITY OF SAN DIEGO; CITY COUNCIL OF THE CITY OF SAN DIEGO; DEVELOPMENT SERVICES DEPARTMENT OF THE CITY OF SAN DIEGO, *Defendants-Appellees*. | No. 11-56861 D.C. No. 3:07-cv-00399-BEN-WVG |
| AMERICAN TOWER CORPORATION, a Delaware corporation; T-MOBILE WEST CORPORATION, a Delaware corporation, *Plaintiffs-Appellants*, v. CITY OF SAN DIEGO, *Defendant-Appellee*, and CITY COUNCIL OF THE CITY OF SAN DIEGO; DEVELOPMENT SERVICES DEPARTMENT OF THE CITY OF SAN DIEGO, *Defendants*. | No. 11-56862 D.C. No. 3:07-cv-00399-BEN-WVG OPINION |

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
April 10, 2013—Pasadena, California

Filed August 14, 2014

Before: Ferdinand F. Fernandez, Johnnie B. Rawlinson,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Telecommunictions Act

The panel affirmed in part and reversed in part the district court's summary judgment on claims that the City of San Diego's denial of continual use permit applications for telecommunications facilities violated the California Permit Streamlining Act, the federal Telecommunications Act, California Code of Civil Procedure § 1094.5, and the Equal Protection Clause.

Reversing the district court's summary judgment in favor of the plaintiff on its claim that the City violated the time limits of the Permit Streamlining Act, the panel concluded

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

that the permit applications were not deemed approved before the City denied them because "the public notice required by law" did not "occur."

The panel affirmed the district court's summary judgment in favor of the City on the other claims. The panel held that under the Telecommunications Act, the City's decision to deny the permit applications was supported by substantial evidence, and the City did not misapply its Land Development Code. The permit denial did not constitute unreasonable discrimination among functionally equivalent service providers because the plaintiff and the City were not functionally equivalent providers. The permit denial did not constitute an effective prohibition of personal wireless services because the plaintiff did not demonstrate that its proposals were the least intrusive means of filling a significant gap in coverage.

The panel held that the plaintiff could not prevail under Cal. Civ. Proc. Code § 1094.5 because it did not have a fundamental vested right to the continued use of its facilities.

The panel held that the permit denial did not violate equal protection because it was rationally related to the City's legitimate interest in minimizing the aesthetic impact of wireless facilities and in providing public communications services.

**COUNSEL**

Christine M. Leone (argued), Chief Deputy City Attorney, Jan I. Goldsmith, City Attorney, Donald R. Worley, Assistant City Attorney, Alexis L. Jodlowski, Deputy City Attorney, Office of the City Attorney, San Diego, California, for Defendants-Appellants/Cross-Appellees.

Robert Jystad (argued), Julian Quattlebaum III (argued), Jamie T. Hall, and Charles J. McLurkin, Channel Law Group, LLP, Long Beach, California, for Plaintiff-Appellee/Cross-Appellant.

Kara L. Azocar, Alexandria, Virginia, for Amicus Curiae PCIA—The Wireless Infrastructure Association.

Amrit S. Kulkarni, Julia L. Bond, and Frank R. Petrilli, Meyers, Nave, Riback, Silver & Wilson, Oakland, California, for Amici Curiae League of California Cities and California State Association of Counties.

**OPINION**

BYBEE, Circuit Judge:

American Tower Corporation (ATC) is a leading owner and operator of telecommunication facilities, some of which are located in the City of San Diego. In 2007, the City denied ATC's Conditional Use Permit (CUP) applications for three of its San Diego facilities. Disappointed with the City's decision, ATC filed suit in federal district court, raising claims under, among other provisions, the California Permit Streamlining Act (PSA), the Federal Telecommunications

Act (TCA), California Code of Civil Procedure § 1094.5, and the Equal Protection Clause of the United States Constitution. The district court granted summary judgment in favor of ATC on the PSA claim and in favor of the City on the other claims. ATC and the City now appeal.

We reverse the district court's grant of summary judgment in favor of ATC on the PSA claim because we conclude that the CUP applications were not deemed approved before the City denied them. Finding no violation of the TCA, California Code of Civil Procedure § 1094.5, or the Equal Protection Clause, we affirm the district court's grant of summary judgment in favor of the City on the remaining claims.

## I.    FACTS AND PROCEDURAL HISTORY

ATC owns and operates cell tower facilities around the world. Three such towers—the Verus, Border, and Mission Valley Facilities—are located in San Diego. The City granted a CUP for the Verus Facility on July 27, 1995, the Border Facility on October 3, 1995, and the Mission Valley Facility on September 12, 1996. Each CUP stated that it would expire ten years from its date of approval, absent renewal, and that the permittee was required to return the site to its original condition at the time of expiration or denial of renewal.

The Verus Facility consists of a ninety-foot monopole with nine antennas and a 200 square-foot equipment shelter, on industrial property in Otay Mesa. The site is prominently visible from Interstate-5, which serves as a major north-south transportation corridor in the City.

The Border Facility consists of a ninety-foot monopole with twenty-one antennas and approximately 440 square feet of equipment shelters, on low-medium density residential-zoned property in San Ysidro. The height limit for this zone is thirty feet, and the site is visible from Interstate-805, going north and south, and the surrounding residential area.

The Mission Valley Facility consists of an approximately 177-foot lattice tower with a number of antennas and an equipment building, on industrial property in Mission Valley. The site is located on the top of a prominent slope and is visible in the Mission Valley neighborhood from Interstate-805.

After the original CUPs expired by their terms, ATC filed a new CUP application for the Verus and Border Facilities on December 1, 2005, and the Mission Valley Facility on February 15, 2007. In response, the City published a Notice of Application for the Verus and Border Facilities on December 16, 2005, and the Mission Valley Facility on March 14, 2007. The City then issued an Assessment Letter regarding each facility, identifying concerns for ATC to address before the City's planning staff could recommend approval of the CUP applications. Most of the City's concerns related to the size and visual impact of the facilities. The City then deemed the CUP applications for the Verus, Border, and Mission Valley Facilities to be exempt from the California Environmental Quality Act (CEQA) on January 13, 2006, February 13, 2007, and July 2, 2007, respectively.

Under the PSA, the City was required to approve or disapprove the CUP applications within sixty days from the date of its determination that the facilities were exempt from the CEQA. Cal. Gov't Code § 65950(a)(4). The City failed to

act on any of the CUP applications within this sixty-day window. Instead, over an extended period, the City and ATC continued to have discussions regarding the CUP applications and what would be required for ATC to obtain the CUPs.

The City published a Notice of Public Hearing for the Verus Facility on March 20, 2007. At the hearing on April 4, 2007, the City denied the Verus Facility CUP application because the project did not comply to the maximum extent feasible with the City's Land Development Code. *See* San Diego Mun. Code § 141.0405 (2001). ATC did not offer siting or design solutions to address the planning staff's concerns, other than agreeing to add additional landscaping and screening for the facility's equipment shelter.

The City published a Notice of Public Hearing for the Border Facility on July 18, 2007. At the hearing on August 8, 2007, the planning staff recommended denial of the CUP application because the project did not comply to the maximum extent feasible with the City's Land Development Code. *See id*. The Hearing Officer continued the hearing and requested that ATC provide a site-specific analysis of how wireless coverage would be affected if the height of the tower were reduced. At a second hearing on September 12, 2007, the City denied the CUP application because ATC had not provided sufficient information to allow the Hearing Officer to make the findings required by the City's Land Development Code.

The City also published a Notice of Public Hearing for the Mission Valley Facility on July 18, 2007. At the hearing on August 8, 2007, ATC offered to minimize the visual impact of the facility by painting the tower, adding additional landscaping, and removing unused mounting arms. The City

planning staff recommended denial of the CUP application because ATC refused to consider other, less visually intrusive design alternatives, such as using architectural features to integrate the facility with its surroundings. The Hearing Officer continued the hearing to allow both sides the opportunity to supplement the record. The City denied the CUP application on September 12, 2007, because the project did not comply to the maximum extent feasible with the City's Land Development Code.

ATC appealed all three CUP denials to the City's Planning Commission. The Planning Commission denied the appeals, finding that the information presented on design and siting solutions was insufficient to meet the requirements of the City's Land Development Code.

In response to the City's denial of the CUP applications, ATC filed suit in federal district court, raising claims under the PSA, the TCA, California Code of Civil Procedure § 1094.5, and the Equal Protection Clause, among other provisions. Both sides moved for summary judgment. The district court granted summary judgment in favor of ATC on its PSA claim, reasoning that the CUP applications were deemed approved when the City failed to make its decisions within the sixty-day window established by § 65950(a)(4). The district court granted summary judgment in favor of the City on the other claims. Both sides timely appealed the district court's adverse rulings.

## II.    STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). "We determine, viewing the evidence in the

light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002). We do not "weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc). When parties file cross-motions for summary judgment, we consider each motion on its merits. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). "We may affirm a grant of summary judgment on any basis the record supports, including one the district court did not reach." *Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd. of Las Vegas*, 257 F.3d 937, 941 (9th Cir. 2001).

## III.    DISCUSSION

There are four claims before us on appeal. First, we consider whether ATC's CUP applications were deemed approved as a matter of law pursuant to the PSA. Second, we address ATC's claims under the TCA: (1) whether the City's decision to deny the CUP applications was supported by substantial evidence, (2) whether the City's decision to deny the CUP applications constituted unreasonable discrimination among functionally equivalent service providers, and (3) whether the City's decision to deny the CUP applications constituted an effective prohibition of personal wireless services. Third, we examine whether ATC has a fundamental vested right to the continued use of its facilities under California Code of Civil Procedure § 1094.5. Fourth, we take up ATC's Equal Protection Clause claim.

A. *The California Permit Streamlining Act Claim*

ATC claims that the City violated the time limits of the PSA and that, as a result, ATC's CUP applications must be deemed approved as a matter of law. The City counters that ATC's CUP applications cannot be deemed approved because the City did not provide public notice of the PSA's deemed approval provision, as required by the statute. Resolution of this claim requires us to determine when a CUP application may be deemed approved under California's labyrinthine PSA.

The PSA states that a CUP application may be deemed approved "only if the public notice required by law has occurred." Cal. Gov't Code § 65956(b). We conclude that "the public notice required by law" requires reasonable notice of a public hearing. Because such notice did not "occur" before the City denied ATC's CUP applications, the CUP applications were not deemed approved, and ATC's PSA claim must fail.

1.  The Statutory Framework

The PSA was enacted in an effort to "ensure clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects." Cal. Gov't Code § 65921. Because the Verus, Border, and Mission Valley Facilities qualify as development projects, the City's decisions on ATC's CUP applications are subject to the PSA. *Id*. §§ 65921, 65928, 65927.

Section 65950 of the PSA states in relevant part: "Any public agency that is the lead agency for a development

project shall approve or disapprove the project within . . . [s]ixty days from the determination by the lead agency that the project is exempt from the [CEQA]."[1]  *Id.* § 65950(a)(4). This is a mandatory time limit. *See Palmer v. City of Ojai*, 223 Cal. Rptr. 542, 550 (Cal. Ct. App. 1986) ("We conclude that the Scheme created a mandatory, rather than a directory duty."). Despite the sixty-day time limit's mandatory nature, however, § 65950 provides for an extension "pursuant to § 65957." *Id.* § 65950(b). Section 65957, in turn, permits a single extension of § 65950's time limit, upon written agreement of the parties, for a period not to exceed ninety days from the date of the extension.[2] "No other extension, continuance, or waiver of [§ 65950's] time limit[]" is permitted, except in limited circumstances not relevant here. *Id.* § 65957; *see also id.* § 65950.1 (providing an exception to § 65957's strict one-time extension of time limit rule "to

---

[1] The City is the "lead agency" in this case. Cal. Gov't Code § 65929 ("'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project.").

[2] Section 65957 provides:

> The time limits established by Sections 65950, 65950.1, 65951, and 65952 may be extended once upon mutual written agreement of the project applicant and the public agency for a period not to exceed 90 days from the date of the extension. No other extension, continuance, or waiver of these time limits either by the project applicant or the lead agency shall be permitted, except as provided in this section and Section 65950.1. Failure of the lead agency to act within these time limits may result in the project being deemed approved pursuant to the provisions of subdivision (b) of Section 65956.

Cal. Gov't Code § 65957.

complete and certify the environmental impact report"). Section 65957 also cautions that the "[f]ailure of the lead agency to act within these time limits may result in the project being deemed approved pursuant to the provisions of subdivision (b) of Section 65956."

Section 65956 provides enforcement for § 65950's time limit.[3] As a general rule, § 65956 states that if the lead

---

[3] Section 65956 provides:

(a) If any provision of law requires the lead agency or responsible agency to provide public notice of the development project or to hold a public hearing, or both, on the development project and the agency has not provided the public notice or held the hearing, or both, at least 60 days prior to the expiration of the time limits established by Sections 65950 and 65952, the applicant or his or her representative may file an action pursuant to Section 1085 of the Code of Civil Procedure to compel the agency to provide the public notice or hold the hearing, or both, and the court shall give the proceedings preference over all other civil actions or proceedings, except older matters of the same character.

(b) In the event that a lead agency or a responsible agency fails to act to approve or to disapprove a development project within the time limits required by this article, the failure to act shall be deemed approval of the permit application for the development project. However, the permit shall be deemed approved only if the public notice required by law has occurred. If the applicant has provided seven days advance notice to the permitting agency of the intent to provide public notice, then no earlier than 60 days from the expiration of the time limits established by Sections 65950 and 65952, an applicant may provide the required public notice

agency fails to act to approve or disapprove a development project within § 65950's time limit, "the failure to act shall be deemed approval of the permit application for the development project." *Id.* § 65956(b). But there's a catch: "[T]he permit shall be deemed approved only if *the public notice required by law* has occurred." *Id.* (emphasis added). Thus, the lead agency's inaction will be deemed approval of

---

using the distribution information provided pursuant to Section 65941.5. If the applicant chooses to provide public notice, that notice shall include a description of the proposed development substantially similar to the descriptions which are commonly used in public notices by the permitting agency, the location of the proposed development, the permit application number, the name and address of the permitting agency, and a statement that the project shall be deemed approved if the permitting agency has not acted within 60 days. If the applicant has provided the public notice required by this section, the time limit for action by the permitting agency shall be extended to 60 days after the public notice is provided. If the applicant provides notice pursuant to this section, the permitting agency shall refund to the applicant any fees which were collected for providing notice and which were not used for that purpose.

(c) Failure of an applicant to submit complete or adequate information pursuant to Sections 65943 to 65944, inclusive, may constitute grounds for disapproving a development project.

(d) Nothing in this section shall diminish the permitting agency's legal responsibility to provide, where applicable, public notice and hearing before acting on a permit application.

Cal. Gov't Code § 65956.

a development project only if two conditions coincide: (1) the agency fails to take action—i.e., approve or disapprove the project—within § 65950's time limit, *and* (2) the "public notice required by law has occurred."

Section 65956 also provides an applicant with two forms of self help. First, the applicant may file an action to compel the lead agency to comply with its legal duty to provide public notice of a development project or hold a public hearing. *Id*. § 65956(a). Second, sixty days after the expiration of § 65950's time limit for approving or disapproving the project, if the applicant provides seven days advance notice to the lead agency of the applicant's intent to provide public notice, the "applicant may provide the required public notice." *Id*. § 65956(b). If the applicant provides public notice, the applicant's public notice must include (1) "a description of the proposed development substantially similar to the descriptions which are commonly used in public notices by the permitting agency," (2) "the location of the proposed development," (3) "the permit application number," (4) "the name and address of the permitting agency," and (5) "a statement that the project shall be deemed approved if the permitting agency has not acted within 60 days." *Id.* Furthermore, if the applicant provides public notice, "the time limit for action by the permitting agency shall be extended to [an additional] 60 days after the public notice is provided." *Id*. Section 65956(b), however, does not alter the lead agency's legal responsibility to provide, where required, public notice and a hearing. *Id*. § 65956(d).

In other words, if the lead agency provides "the public notice required by law," the permit application is deemed approved sixty days after the development project is deemed

to be exempt from the CEQA, unless the parties agree in writing to a one-time extension for up to ninety days. *Id*. §§ 65950(a)(4), 65956(b), 65957. In contrast, if the applicant provides public notice, the permit application is deemed approved, at the earliest, 180 days after the development project is deemed to be exempt from the CEQA.[4] *Id*. § 65956(b).

## 2.  "The Public Notice Required by Law"

The parties do not dispute (1) that the City published a Notice of Application for each facility; (2) that the facilities were later deemed exempt from the CEQA; (3) that the City failed to hold a hearing or act on the CUP applications within sixty days from the date that the facilities were deemed exempt from the CEQA, as required by § 65950(a)(4); (4) that the City subsequently published a Notice of Public Hearing and held a hearing for each facility; and (5) that ATC did not publish its own public notice pursuant to the self-help provision of § 65956(b). Thus, the merits of ATC's PSA claim turn on the definition of the phrase "public notice required by law" in § 65956(b). If the public notice required

---

[4] To illustrate this complex provision, we offer the following example. The Verus Facility was deemed to be exempt from the CEQA on January 13, 2006. Therefore, under § 65950(a)(4), the City had sixty days (absent a one-time extension for up to ninety days pursuant to § 65957)—until March 14, 2006—to give any appropriate notices, conduct any hearings, and approve or disapprove the CUP application. If, however, the City failed to provide "the public notice required by law," and ATC had wanted to exercise its self-help rights, ATC could have given public notice after an additional sixty days—on May 13, 2006—provided that ATC gave the City seven days' notice of its intent to do so. Cal. Gov't Code § 65956(b). The City then would have had an additional sixty days—until July 12, 2006—to act on the CUP application before it would have been deemed approved. *Id*. July 12, 2006, is 180 days after January 13, 2006.

by law "occurred" before the City denied ATC's CUP applications, the CUP applications must be deemed approved as a matter of law. *Id*. § 65956(b). If, however, the public notice required by law did not "occur" before the City denied ATC's CUP applications, the CUP applications cannot be deemed approved, and ATC's PSA claim must be denied. *Id*.

ATC contends that the California Supreme Court's decision in *Bickel v. City of Piedmont*, 946 P.2d 427 (Cal. 1997), *superseded by statute as recognized in Riverwatch v. Cnty. of San Diego*, 91 Cal. Rptr. 2d 322, 328–29 (Cal. Ct. App. 1999), controls the definition of "public notice required by law." In *Bickel*, the California Supreme Court held that an applicant could waive its right to deemed approval by cooperating with a lead agency's lengthy processing of its application.[5] *Id*. at 433–34. Although the court did not directly address the definition of "public notice required by law" under § 65956, it did include the following footnote:

> Under section 65956, an applicant can compel an agency to give public notice of a development project or to hold a public hearing, or both, and the statute provides a means for the applicant to give public notice. *Because in this case the city gave public notice and held public hearings, these statutory provisions are not in issue here*.

*Id.* at 430 n.2 (emphasis added) (citation omitted). Based on this footnote, ATC argues that the California Supreme Court has held that § 65956(b)'s notice requirement is satisfied

---

[5] In response, the legislature amended § 65957 to preclude this kind of waiver. *Riverwatch*, 91 Cal. Rptr. 2d at 328–29.

wherever the lead agency gives any form of public notice for a public hearing. Because the City gave public notice and failed to act within sixty days after ATC's facilities were deemed exempt from the CEQA, ATC contends that its permit applications must be deemed approved.

If ATC were correct, we would be bound to follow *Bickel* and conclude that the public notice here was sufficient. *See Reinkemeyer v. SAFECO Ins. Co. of Am.*, 166 F.3d 982, 984 (9th Cir. 1999) (per curiam) ("[W]e are bound by state supreme court interpretations of state law."). But ATC is mistaken. The *adequacy* of public notice was not at issue in *Bickel*. Accordingly, the California Supreme Court had no occasion to interpret the phrase "public notice required by law" under § 65956(b), and the *Bickel* footnote is too thin to control our analysis in this case. *Galam v. Carmel (In re Larry's Apartment, L.L.C.)*, 249 F.3d 832, 839 (9th Cir. 2001) ("[Q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having so decided as to constitute precedents." (internal quotation marks and citation omitted)).

In opposition to ATC's position, the City contends that the California Court of Appeal's decision in *Mahon v. County of San Mateo*, 43 Cal. Rptr. 3d 235 (Cal. Ct. App. 2006), controls the definition of "public notice required by law." In *Mahon*, the court held that such notice must contain a statement that the permit will be deemed approved if the lead agency does not act within § 65950's time limits, regardless of whether the notice is provided by the lead agency or the applicant. *Id*. at 243. The court acknowledged that § 65956(b) requires this warning only when *the applicant* gives public notice, but it could find "no reason why the Legislature would require an applicant to send out anything *more* than 'public

notice required by law.'" *Id*. at 242. In effect, the court said that the lead agency must warn the public that its own failure to act will result in the application being deemed approved and that if the lead agency does not include such a warning, the lead agency has failed to give "the public notice required by law." The court thus construed the lead agency's duty to provide public notice to include at least those disclosures that § 65956(b) specifically requires of the applicant. The City argues that because it failed to include the "deemed approved" language in its public notice, the public notice was ineffective to trigger § 65956's automatic approval provision.

If the City were correct that *Mahon* controlled our interpretation of the phrase "public notice required by law," we would be compelled to conclude that "the public notice required by law" did not "occur" here, since the City's notice did not contain a statement that ATC's CUP applications would be deemed approved if the City did not act within § 65950's time limit. But like ATC, the City is mistaken. "An intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court *unless* it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982) (emphasis added) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)); *see also Hayes v. Cnty. of San Diego*, 658 F.3d 867, 871–72 (9th Cir. 2011). *Mahon* does not control our interpretation of § 65956(b), although it may afford guidance as to how the California Supreme Court would interpret that provision.

Here, the text of the statute is "persuasive data" that the California Court of Appeal misinterpreted § 65956(b) in *Mahon*. Section 65956(b) does not define the phrase "public

notice required by law." It simply states that such notice must have "occurred" before the lead agency's failure to act may be deemed approval of a permit application. Cal. Gov't Code § 65956(b). Section 65956(b) then changes track to specify the content of the public notice the applicant is required to provide in order to exercise self help:

> *If the applicant* chooses to provide public notice, *that notice* shall include a description of the proposed development substantially similar to the descriptions which are commonly used in public notices by the permitting agency, the location of the proposed development, the permit application number, the name and address of the permitting agency, and a statement that the project shall be deemed approved if the permitting agency has not acted within 60 days.

*Id*. (emphasis added). As the qualifying phrase "[i]f the applicant chooses to provide public notice" suggests, these requirements apply only to applicants. Despite this qualifying phrase, the California Court of Appeal imposed § 65956(b)'s requirements on the lead agency as well, reasoning that the inclusion of such a qualifying phrase does not suggest that the legislature intended a different standard for the notice provided by the lead agency. *Mahon*, 43 Cal. Rptr. 3d at 242. By reading out the qualifying phrase "[i]f the applicant chooses to provide public notice," the California Court of Appeal violated the "fundamental canon of statutory construction that a statute should not be construed so as to render any of its provisions mere surplusage." *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003); *see also*

*Bowsher v. Merck & Co.*, 460 U.S. 824, 833 (1983) (restating "the settled principle of statutory construction that we must give effect . . . to every word of the statute"). We do not believe the California Supreme Court would do the same and therefore reject *Mahon*'s interpretation of "public notice required by law."

Our disagreement with *Mahon*'s ultimate interpretation notwithstanding, we agree with the California Court of Appeal that because § 65956(b) places no restriction on the word "law," "the public notice required by law" must be a function of statutory and constitutional law. *Mahon*, 43 Cal. Rptr. 3d at 241–42. We begin with the PSA. As we have already indicated, § 65956 does not spell out what the lead agency must include in its public notice. Nor does any other provision of the PSA. Indeed, the only guidance we have in the PSA is § 65956(d), which states that "[n]othing in [§ 65956] shall diminish the permitting agency's legal responsibility to provide, where applicable, public notice and hearing before acting on a permit application." Accordingly, we must look beyond the PSA for relevant provisions— statutory and constitutional—that require public notice or a hearing before acting on a permit application under these circumstances.

We find relevant statutory provisions in the San Diego Municipal Code, which imposes certain notice requirements on the City before it may approve permit applications. The City classified the Verus, Border, and Mission Valley Facilities as Major Telecommunication Facilities. Section 141.0405(f) requires that CUP applications for Major Telecommunication Facilities be "decided in accordance with Process Three." San Diego Mun. Code § 141.0405(f) (2001). Process Three, in turn, requires (1) that Notice of Application

be sent pursuant to § 112.0302(b) no later than ten business days after the date on which an application is deemed complete,[6] (2) that Notice of Public Hearing be provided pursuant to § 112.0301(c),[7] (3) that Notice by Mail be provided pursuant to § 112.0302, and (4) that Published Notice be provided pursuant to § 112.0303. Conspicuously absent from all of these provisions is a requirement that the City provide notice that the CUP applications shall be deemed approved if the City has not acted within the time limits of the PSA. What is more, the parties do not dispute that the City has complied with the notice provisions of the San Diego Municipal Code. We therefore conclude that the

---

[6] The Notice of Application must include (1) a general description of the proposed development; (2) the location and size of the property that is the subject of the application; (3) the community planning area in which the proposed development is located and the name of the community planning group's designated contact person, if any; (4) the name and telephone number of the City staff person to contact for additional information; and (5) the name of the applicant and, with the consent of the applicant, the applicant's address and telephone number. San Diego Mun. Code § 112.0301(a)(1) (2001).

[7] The Notice of Public Hearing must include (1) the general subject of the public hearing, including the type of development permit and the name of the proposed development; (2) the location and size of the property that is the subject of the application; (3) the community planning area in which the proposed development is located; (4) a general description of the proposed development; (5) the name of the applicant and, with the consent of the applicant, the applicant's address and telephone number; (6) the identity of the decision maker holding the public hearing; (7) the date, time, and place of the public hearing; (8) a brief description of the general procedures concerning the conduct of the hearing and the requirements for filing an appeal; (9) the definition of an interested person for purposes of appeal; and (10) the name and telephone number of the City staff person to contact for additional information. San Diego Mun. Code § 112.0301(c)(1) (2001).

City satisfied the statutory component of "public notice required by law."

Next, we examine the constitutional principles underlying that phrase. The California Supreme Court's decision in *Horn v. County of Ventura*, 596 P.2d 1134 (Cal. 1979), guides our analysis. There, the court considered whether a property owner was entitled to notice and an opportunity to be heard before the County of Ventura approved a subdivision map on an adjacent lot. *Id*. at 1136. The court held that when adjudicatory land use decisions constitute "a substantial or significant deprivation of the property rights of other landowners, the affected persons are entitled to a reasonable notice and an opportunity to be heard before the approval occurs." *Id*. at 1140. The property owner alleged that the proposed subdivision would detrimentally affect his interests by hindering access to his property and generating traffic, parking congestion, and air pollution. *Id*. at 1136, 1139. The court found these allegations sufficiently "substantial" to trigger procedural due process protections. *Id*. at 1139.

The *Horn* court did not explicitly ground its analysis in either Article I, Section 7, of the California Constitution or the Fourteenth Amendment to the United States Constitution. Rather, the court cited both its own precedent and United States Supreme Court precedent in describing what it referred to as "[t]he general application of due process principles." *Id*. at 1140. Despite this ambiguity, we view *Horn*'s holding as rooted in the due process protections of the California Constitution for two reasons. First, the court did not cite or apply *Mathews v. Eldridge*, 424 U.S. 319 (1976), which established the now-familiar framework for evaluating the sufficiency of administrative procedures under the federal Constitution. *Id*. at 334–35. *Horn* was decided in 1979, three

years after *Mathews*. If the California Supreme Court were reaching the federal constitutional issue—rather than merely looking to a federal analogue for guidance—we think it unlikely the court would have omitted such an important citation. The fact that the California Supreme Court had cited *Mathews* and had applied its framework prior to *Horn* strengthens our conclusion. *See, e.g.*, *Civil Serv. Ass'n v. City & Cnty. of S.F.*, 586 P.2d 162, 167–68 (Cal. 1978).

Second, although California "ha[s] looked to the United States Supreme Court's precedents for guidance in interpreting the contours of [its] own due process clause and ha[s] treated the state clause's prescriptions as substantially overlapping those of the federal Constitution," California's due process protections are, at times, broader than those imposed by the Fourteenth Amendment. *Today's Fresh Start, Inc. v. L.A. Cnty. Office of Educ.*, 303 P.3d 1140, 1149 (Cal. 2013). For example, when evaluating the sufficiency of administrative procedures under the state constitution, California courts may consider "the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." *Id*. at 1150 (internal quotation marks and citations omitted). Therefore, because the *Horn* court did not apply the *Mathews* framework and the federal and state due process clauses are not coextensive, we construe *Horn* to hold that California due process protections require reasonable notice and an opportunity to be heard before a lead agency makes an adjudicatory land use decision that constitutes a substantial or

significant deprivation of other landowners' property rights.**[8]**
*Horn*, 596 P.2d at 1140.

The question then becomes whether the automatic approval of ATC's CUP applications would constitute a substantial or significant deprivation of other landowners' property interests, such that the denial of reasonable notice and a hearing would violate due process. ATC claims that the automatic approval of its CUP applications would not constitute a substantial or significant deprivation for two reasons. First, ATC argues that because the facilities are already in existence, their continued presence cannot possibly deprive adjacent landowners of any property rights. This argument ignores ATC's obligation to return the sites to their original condition now that the original CUPs have expired by their terms. Although as a practical matter, ATC seeks to continue the use of its facilities, as a legal matter, ATC seeks to alter the status quo rather than maintain it.

Second, ATC contends that the facilities can have no cognizable impact on other landowners because all of the adjacent properties are either freeways, vacant land, or industrial facilities. ATC's contention is inconsistent with the record, which reveals that the Border Facility is located on low-medium density residential-zoned property and that the Mission Valley Facility is adjacent to multi-family residential property. Furthermore, even if all of the adjacent properties were as ATC contends, ATC's facilities would still have a significant impact on them. Dozens of antennas perched on hundreds of feet of towers alongside hundreds of square feet of equipment shelters may not seem like a cognizable impact

---

**[8]** We express no opinion on the requirements of the Due Process Clause of the Fourteenth Amendment here.

to ATC, but we believe most landowners would beg to differ. ATC's point is better directed to whether other landowners will likely object to the renewal of ATC's applications, not to whether ATC has a legal obligation to give them notice of the proposed action.

Accordingly, we have little trouble finding that the automatic approval of ATC's CUP applications would constitute a substantial or significant deprivation of other landowners' property interests and that due process protections therefore apply. These protections include reasonable notice and an opportunity to be heard. *Id*. And as the California Supreme Court made clear in *Horn*, the "[n]otice must, of course, occur sufficiently prior to a final decision to permit a meaningful predeprivation hearing to affected landowners." *Id*. at 1141 (internal quotation marks omitted).

In sum, we hold that "the public notice required by law" in this case includes the statutory provisions of the San Diego Municipal Code and the due process protections set forth in *Horn*.[9] Although the statutory provisions do not compel a statement that the CUP applications shall be deemed

---

[9] Were it not for the protections of due process, § 65956 would create the possibility of collusion between the applicant and the lead agency. As we have indicated, § 65956 incorporates the notice requirements imposed by local law. Cal. Gov't Code § 65956(d). If "the public notice required by law" were limited to these provisions, the lead agency might be able to provide the required notice, choose not to hold a public hearing, and allow the permit applications to be deemed approved without any opportunity for input from affected landowners. Due process intervenes to remove the possibility of collusion against these affected landowners by guaranteeing them reasonable notice and an opportunity to be heard before the approval occurs. *Horn*, 596 P.2d at 1140.

approved if the City has not acted within the time limits of the PSA, due process requires reasonable notice to "occur" in time for affected landowners to participate in a meaningful pre-deprivation hearing.[10]

### 3.    Insufficient Public Notice

In light of the foregoing, it is clear that "the public notice required by law" did not "occur" before the City denied

---

[10] We often speak of an individual or entity "giving" notice. As a result, we usually think of notice as a discrete event at a specific time. Here, however, we have spoken of notice "occurring." We have done so for two reasons. First, the relevant statute for our analysis, § 65956(b), uses the verb "occur." Cal. Gov't Code § 65956(b) ("[T]he permit shall be deemed approved only if the public notice required by law has *occurred*."(emphasis added)). Second, in *Horn*, the California Supreme Court used the verb "occur" to define the due process requirements for notice in this very context. 596 P.2d at 1141 ("Notice must, of course, *occur* sufficiently prior to a final decision to permit a meaningful predeprivation hearing to affected landowners." (internal quotation marks omitted)). The difference between the active construction—an individual or entity "giving" notice—and the passive construction here—notice "occurring"—is significant. Under *Horn*, once the protections of due process are triggered, we see a familiar sequence: (1) publication of notice, (2) hearing, and (3) final decision. But curiously, *Horn* tethers the timing of the "occurrence" of notice to *the decision* on the merits, not to the hearing: the notice must "occur" sufficiently prior to the final decision to permit a meaningful predeprivation hearing to affected landowners. *Horn* thus uses the concept of notice, together with a sequential relationship between the "occurrence" of notice and the final decision, to secure a meaningful predeprivation hearing, not just to notify affected landowners of potential agency action. Under *Horn*, therefore, notice is an extended concept that begins with publication and cannot be complete before a meaningful predeprivation hearing for affected landowners.

ATC's CUP applications.[11] The City published a Notice of Public Hearing for the Verus Facility on March 20, 2007, and the Border and Mission Valley Facilities on July 18, 2007.[12] The City then denied each permit shortly thereafter at a public

---

[11] Much of the confusion surrounding § 65956(b) arises from this passive construction, which disguises the author of the notice. At first blush, this construction suggests that "the public notice required by law" is the same regardless of whether the author is the lead agency or the applicant. Digging a little deeper, we see that this cannot be the case. Section 65956 makes clear that only the lead agency has a legal obligation to give public notice. Cal. Gov't Code §§ 65956(b), (d). Section 65956, however, does not actually dictate the content of this public notice. Instead, as we have discussed, § 65956 incorporates statutory and constitutional provisions—"the public notice required by law"—including the notice requirements of local law and the protections of due process.

In contrast to the lead agency, the applicant has no legal obligation to give, for example, the public notice required by the San Diego Municipal Code or the California Constitution. Section 65956(b) simply gives the applicant the option to exercise self help. Only if the applicant chooses to exercise this option does § 65956(b) spell out the content of the notice that the applicant must give in order to do so. This notice is entirely distinct from that required of the lead agency, partially in recognition of the fact that affected landowners may not appreciate the significance of public notice provided by a private party. To that end, § 65956(b) requires the applicant to warn affected landowners that the project shall be deemed approved if the lead agency has not acted within sixty days. We thus reject the notion that § 65956(b)'s passive construction requires the same public notice from the lead agency and the applicant.

[12] We note that the City published a Notice of Application for the Verus and Border Facilities on December 16, 2005, and the Mission Valley Facility on March 14, 2007. But under *Horn*, the relevant public notice for purposes of due process is the notice of a *hearing*, not merely notice that an *application* has been filed. 596 P.2d at 1141.

hearing.[13] As the California Supreme Court held in *Horn*, the due process component of "the public notice required by law" protects affected landowners' right to meaningful participation at a public hearing, meaning that such notice cannot be complete before the hearing itself. *Id*. Consequently, ATC's CUP applications were not deemed approved under § 65956(b), and the City is entitled to judgment as a matter of law on ATC's PSA claim.

This is not to say that applicants have to put up with unreasonable delay. We recognize that "the Legislature enacted the [PSA] to relieve applicants from protracted and unjustified governmental delays in processing their permit applications." *Bickel*, 946 P.2d at 429. To that end, § 65956 provides an applicant with two avenues of self help. Cal. Gov't Code § 65956. An applicant may file an action in court to compel the lead agency to provide public notice and hold a public hearing. *Id*. § 65956(a). Alternatively, an applicant may provide its own public notice of the proposed action. *Id*. § 65956(b). ATC did neither.

In summary, a lead agency must act on a CUP application within the time limits provided in the PSA, and if it does not act, the CUP application is deemed approved. But when other landowners are affected, such deemed approval would be improper unless the lead agency holds a properly noticed hearing—i.e., a hearing that complies with the requirements of due process. As the PSA itself indicates, the CUP

---

[13] The hearing for the Verus Facility was held on April 4, 2007, only fifteen days after the Notice of Public Hearing was published. The hearings for the Border and Mission Valley Facilities were held on August 8, 2007, and September 12, 2007, the latter only fifty-six days after the Notices of Public Hearing were published.

application is not deemed approved in that instance. Once a properly noticed hearing is held, the lead agency can actually decide the issue. If the lead agency then denies the CUP application, that is an end to application process, and the applicant can pursue any other available remedies. If the lead agency actually approves the CUP application after the hearing, an aggrieved party can pursue available remedies at that point. If, after the hearing, the lead agency does nothing, the CUP application will be deemed approved at some point. Here, we need not decide at what precise point that would happen, or at what point an aggrieved party could pursue available remedies regarding the deemed approval. In the case before us, the City denied the CUP applications during the hearings, and therefore the CUP applications could not be deemed approved. Accordingly, we disagree with the district court and reverse the judgment for ATC on this ground.

## B.  *The Federal Telecommunications Act Claims*

ATC advances three claims under the TCA. First, ATC claims that the City's decision to deny the CUP applications was not supported by substantial evidence because the City misapplied its own Land Development Code. *See* 47 U.S.C. § 332(c)(7)(B)(iii). Second, ATC claims that the City's denial of the CUP applications constituted unreasonable discrimination among providers of functionally equivalent services. *See id*. § 332(c)(7)(B)(i)(I). And third, ATC claims that the City's denial of the CUP applications constituted an effective prohibition of personal wireless services. *See id*. § 332(c)(7)(B)(i)(II). We affirm the district court's grant of summary judgment in favor of the City on all three claims. The City evaluated the CUP applications under the proper provision of the Land Development Code and supported its decision to deny the CUP applications with substantial

evidence. In addition, the City did not unreasonably discriminate among providers of functionally equivalent services because ATC and the City are not functionally equivalent providers. Finally, ATC's effective prohibition claim fails because ATC did not demonstrate that its proposals were the least intrusive means of filling a significant gap in coverage.

1. "Substantial Evidence"

Under the TCA, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be . . . supported by substantial evidence contained in a written record." *Id*. § 332(c)(7)(B)(iii). We have held that "this language is meant to trigger the traditional standard used for judicial review of agency decisions." *MetroPCS, Inc. v. City & Cnty. of S.F.*, 400 F.3d 715, 723 (9th Cir. 2005) (internal quotation marks and citations omitted). However, the substantial evidence inquiry does not incorporate the substantive federal standards imposed by the TCA. *Id*. Instead, this inquiry requires us to determine "whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*." *Id*. at 723–24. "In other words, we must take applicable state and local regulations as we find them and evaluate the City decision's evidentiary support (or lack thereof) relative to those regulations." *Id*. at 724. The substantial evidence inquiry is deferential: "[we] may not overturn the [City's] decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and [is] supported by a reasonable amount of evidence (i.e., more than a 'scintilla' but not necessarily a preponderance)." *Id*. at 725.

Here, local law prohibited the City from approving ATC's CUP applications unless the facilities "[would] comply to the maximum extent feasible with the regulations of the Land Development Code." San Diego Mun. Code § 126.0305(c) (2001). Because the City could not make this finding for any of ATC's facilities, it denied ATC's CUP applications. Specifically, the City classified the Verus, Border, and Mission Valley Facilities as Major Telecommunication Facilities under the Land Development Code. "Major telecommunication facilities [must] be designed to be minimally invasive through the use of architecture, landscape architecture, and siting solutions." *Id*. § 141.0405(f)(2) (2001). The City was unable to find that ATC had complied with this requirement "to the maximum extent feasible," *id*. § 126.0305(c) (2001), and thus could not approve ATC's CUP applications.

ATC's sole contention on appeal is that the City's decision to deny the CUP applications was not supported by substantial evidence because the City applied the wrong design standard. That is, according to ATC, the City erroneously applied the design standard for *Minor* Telecommunication Facilities rather than the design standard for *Major* Telecommunication Facilities. As proof, ATC cites the design standard for Minor Telecommunication Facilities, which states that "[a]n antenna facility will be considered a minor telecommunication facility if the facility . . . is concealed from public view or integrated into the architecture or surrounding environment." *Id*. § 141.0405(e)(1) (2001). Thus, in ATC's view, the key distinction between Major and Minor Telecommunication Facilities is that Minor Telecommunication Facilities can be concealed from public view or integrated into their surroundings, and Major Telecommunication Facilities cannot. Despite this key

distinction, however, the City repeatedly suggested that ATC needed to "conceal" or "integrate" its facilities in order to obtain the desired CUPs. Because the City allegedly evaluated the CUP applications under the design standard for Minor Telecommunication Facilities, ATC argues that the City's denials could not have been supported by substantial evidence, and the judgment of the district court in favor of the City must be reversed.

ATC misinterprets the law and mischaracterizes the record. The line of demarcation between Major and Minor Telecommunication Facilities is not the possibility of concealment or integration, as ATC suggests. On the contrary, the Land Development Code expressly requires concealment or integration of Major Telecommunication Facilities under certain circumstances. *Id*. § 141.0405(f)(1)(C) (2001) (stating that Major Telecommunication Facilities are not permitted "[w]ithin ½ mile of another major telecommunication facility, unless the proposed facility will be concealed from public view or integrated into the architecture or surrounding environment"). What is more, the record makes it perfectly clear that the City properly evaluated the CUP applications under the design standard for Major Telecommunication Facilities. In each written decision, the Hearing Officer set out the design standards for both Major and Minor Telecommunication Facilities. She then stipulated that the relevant CUP application was for a Major Telecommunication Facility and found that the proposed facility did not conform to the Land Development Code's requirement that Major Telecommunication Facilities "be designed to be minimally visible through the use of architecture, landscape architecture, and siting solutions." *Id*. § 141.0405(f)(2) (2001). Because the Hearing Officer could not find that ATC's facilities

complied to the maximum extent feasible with this requirement, she denied the CUP applications. There was no legal error.

Furthermore, on the merits, the City supported its decision to deny the CUP applications with substantial evidence. From the time ATC filed its CUP applications to the time the City denied them, the City continually expressed its concerns regarding the visual impact of the facilities. These concerns arose out of the City's duty to find that the facilities complied to the maximum extent feasible with the regulations of the Land Development Code, including the requirement that Major Telecommunication Facilities be minimally invasive.[14] *Id*. §§ 126.0305(c) (2001), 141.0405(f)(2) (2001). In response, ATC consistently refused to consider modifications that involved reduction in height or redesign of the towers. Based on this record, we find that the City's decision was authorized by the relevant regulations and was supported by a "reasonable amount" of evidence in the record, i.e., more than a scintilla but not necessarily a preponderance. *MetroPCS, Inc.*, 400 F.3d at 725. Accordingly, the City's decision was supported by "substantial evidence" under the TCA, and the district court properly granted summary judgment in favor of the City on this claim. *Id*.

2.   "Unreasonable Discrimination"

The TCA provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality

---

[14] We have held that aesthetic concerns may be a valid basis for zoning decisions. *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 994 (9th Cir. 2009).

thereof . . . shall not unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I). "[P]roviders alleging unreasonable discrimination must show that they have been treated differently from other providers whose facilities are *similarly situated* in terms of the *structure, placement or cumulative impact* as the facilities in question." *MetroPCS, Inc.*, 400 F.3d at 727 (internal quotation marks and citation omitted). The aggrieved providers must then show that the discrimination was, in fact, unreasonable. *Id.* ("[S]ome discrimination among providers of functionally equivalent services is allowed. Any discrimination need only be reasonable." (internal quotation marks and citation omitted)).

ATC identifies only one allegedly "similarly situated" provider: the City. ATC claims that the City is "similarly situated" because ATC and the City both operate telecommunication facilities, provide similar services, and collect significant revenue from their operations. For example, ATC emphasizes that ATC and the City provide both commercial and emergency communications services. In addition, ATC points out that the City has generated substantial revenue from its communications network through private leases, as does ATC.

These relevant similarities notwithstanding, ATC and the City are not "similarly situated" providers. In contrast to ATC's telecommunication operations, which are entirely commercial, the City's telecommunication operations are primarily public in nature. The City provides communications services to its water, fire, and police departments, as well as other government agencies. By providing these services in house, the City produces an important public benefit without private-sector cost. And although the City does generate some

revenue through private leases, it does not advertise available space to wireless carriers, which demonstrates the minimal degree to which the City is engaged in any form of competition with ATC. This record simply cannot support a finding that ATC and the City provide functionally equivalent services. As a result, we conclude that ATC and the City are not "similarly situated" providers for purposes of the TCA.

Moreover, even if ATC and the City were "similarly situated" providers, the City's discrimination would be reasonable. The City denied the CUP applications based on aesthetic concerns. As we have recognized, "these are legitimate concerns for a locality." *City of Anacortes*, 572 F.3d at 994. ATC contends that it was unreasonable for the City to deny its CUP applications because the City's telecommunication facilities were as visually invasive as ATC's. We are in no position to evaluate this factual contention. But even if the City's facilities were eyesores, aesthetic concerns are not absolute. The City was free to take other factors into consideration when authorizing its own facilities. Because ATC and the City are not "similarly situated" providers and the City's discrimination against ATC was not unreasonable, the unreasonable discrimination claim fails as a matter of law.

3.  "Effective Prohibition"

The TCA mandates that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). A locality violates this provision "if it prevent[s] a wireless provider from

closing a 'significant gap' in service coverage." *City of Anacortes*, 572 F.3d at 995 (citation omitted). We have adopted a two-pronged analysis, "requiring (1) the showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations." *Id*. (internal quotation marks and citation omitted). The significant gap prong is satisfied "whenever a provider is prevented from filling a significant gap in *its own* service coverage." *MetroPCS, Inc.*, 400 F.3d at 733. We evaluate the feasibility prong under a "least intrusive means" standard, which "requires that the provider show that the manner in which it proposes to fill the significant gap in services is the *least intrusive on the values that the denial sought to serve*." *City of Anacortes*, 572 F.3d at 995 (internal quotation marks and citation omitted).

Because the district court assumed a significant gap in service coverage, we limit our review to the feasibility prong. In determining whether ATC met its burden of demonstrating that its facilities were the "least intrusive means," we examine the City's stated ground for concluding otherwise. *Id*. at 996. As discussed previously, the City denied the CUP applications because it was unable to find that the facilities complied to the maximum extent feasible with the regulations of the Land Development Code, including the requirement that Major Telecommunication Facilities be minimally invasive. San Diego Mun. Code §§ 126.0305(c) (2001), 141.0405(f)(2) (2001). To prevail on this claim, therefore, ATC must show that its facilities were the "least intrusive means" in light of the aesthetic values that motivated the City's decision to deny the CUP applications.

ATC has not borne its burden. During the review process, ATC rejected relocation of the facilities or modifications that

involved reduction in height or redesign of the towers. ATC essentially insisted that the City accept *ATC*'s conclusion that the existing facilities were the "least intrusive means," without offering a feasibility analysis of alternative designs or sites for *the City* to reach its own conclusion. In effect, ATC would make the applicant—rather than the locality—the arbiter of feasibility and intrusiveness, gutting the "least intrusive means" standard with predictable, applicant-friendly results.

As we explained in *MetroPCS*, *Inc.*, the "least intrusive means" standard "allows for a meaningful comparison of alternative sites . . . [and] gives providers an incentive to choose the least intrusive [means] in their first [ ] application[]." 400 F.3d at 734–35. To achieve these objectives, the applicant must make a prima facie showing of effective prohibition, which the locality may then rebut by demonstrating the existence of a potentially available and technically feasible alternative. *City of Anacortes*, 572 F.3d at 996–99. ATC did not adduce evidence allowing for a meaningful comparison of alternative designs or sites, and the City was not required to take ATC's word that these were the best options. Consequently, ATC failed to show that its facilities were the least intrusive means of filling a significant gap in service coverage, and the City is entitled to judgment as a matter of law on the effective prohibition claim. *Cf. id.* at 989, 996–99 (finding a violation of  § 332(c)(7)(B)(i)(II) where the provider made a prima facie showing of effective prohibition, including an analysis of eighteen alternative sites, and the locality failed to rebut the prima facie showing with evidence of available alternative sites).

## C.  *California Code of Civil Procedure § 1094.5 Claim*

ATC claims that the district court erred in evaluating the City's decision to deny the CUP applications for substantial evidence because ATC had a fundamental vested right to continue its operation of the Verus, Border, and Mission Valley Facilities. "The grant or denial of a conditional use permit is an administrative or quasi-judicial act. Judicial review must be in accordance with [California] Code of Civil Procedure section 1094.5." *Goat Hill Tavern v. City of Costa Mesa*, 8 Cal. Rptr. 2d 385, 388 (Cal. Ct. App. 1992) (internal citations omitted). "If [an administrative] decision does not substantially affect a fundamental vested right, the trial court considers only whether the findings are supported by substantial evidence in light of the whole record." *Id*. If, however, "an administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence." *Id*.

"The term 'vested' in the sense of 'fundamental vested rights' to determine the scope of judicial review . . . is not synonymous with its use in the 'vested rights' doctrine relating to land use and development." *Whaler's Village Club v. Cal. Coastal Comm'n*, 220 Cal. Rptr. 2, 8 (Cal. Ct. App. 1985). "Whether an administrative decision substantially affects a fundamental vested right must be decided on a case-by-case basis." *301 Ocean Ave. Corp. v. Santa Monica Rent Control Bd.*, 279 Cal. Rptr. 636, 641 (Cal. Ct. App. 1991). "[N]o exact formula exists by which to make this determination, [but] courts are less sensitive to the preservation of purely economic interests." *Id*. (internal citation omitted). "[T]he issue in each case is whether the

affected right is deemed to be of sufficient significance to preclude its extinction or abridgment by a body lacking *judicial* power." *Id.* (internal quotation marks, alterations, and citation omitted).

ATC does not have a fundamental vested right to the continued operation of the Verus, Border, and Mission Valley Facilities. The original CUP for each facility contained an express provision stating that the CUP would expire ten years from the date of its approval, absent renewal. Additionally, the original CUP for each facility declared that the permittee was required to return the site to its original condition at the time of expiration or denial of renewal. ATC allowed the original CUPs to expire by their terms. As the permittee, ATC had a legal obligation to remove the facilities and return the sites to their original condition. By failing to obtain new CUPs before the originals expired, ATC abandoned any right it had to continue operating the facilities; it could not reasonably rely on the CUPs' renewal.

Despite the expiration of the original CUPs, ATC contends that it had a reasonable expectation of renewal because the City issued "extension of time" provisions on CUPs for similar facilities; the City granted collocation permits on the Verus, Border, and Mission Valley sites; these facilities are integral components of ATC's telecommunication network; and ATC would suffer financial loss if its CUP applications were denied. We disagree. The City's conduct with third parties cannot affect ATC's reasonable expectations in the face of the plain language of the original CUPs. Moreover, the importance of the Verus, Border, and Mission Valley Facilities to ATC's telecommunication network and the financial loss ATC would suffer if its CUP applications were denied are purely

economic interests that do not rise to the level of a fundamental vested right under California law. *See*, *e.g.*, *San Marcos Mobilehome Park Owners' Ass'n v. City of San Marcos*, 238 Cal. Rptr. 290, 294 (Cal. Ct. App. 1987) (denying rent increase in rent controlled building did not implicate a fundamental vested right as a purely economic interest); *Mobil Oil Corp. v. Superior Court*, 130 Cal. Rptr. 814, 818, 823–24 (Cal. Ct. App. 1976) (requiring installation of vapor recovery systems at gas stations did not implicate a fundamental vested right as a purely economic interest).

ATC relies on the California Court of Appeal's decision in *Goat Hill Tavern* to argue that we should disregard the expiration of the original CUPs. There, the owner of a tavern that had been in existence for thirty-five years applied for a new CUP to accommodate a $1.75 million refurbishment of the tavern. *Goat Hill Tavern*, 8 Cal. Rptr. 2d at 390. The tavern owner obtained a CUP that expired just six months later. *Id*. at 386. The city subsequently denied the tavern owner's application to renew the six-month CUP. *Id*. at 387. The tavern owner then sued the city for a writ of mandate under California Code of Civil Procedure § 1094.5. *Id*. at 388. The trial court found that the tavern owner had a fundamental vested right and that the city's decision was not supported by the evidence. *Id*. at 391. In affirming the trial court's decision, the California Court of Appeal reasoned that it was "utterly implausible that [the tavern owner] knowingly gave up all rights to continue operating Goat Hill Tavern in exchange for the opportunity to keep his game room expansion open for six months." *Id*. at 391 n.4.

*Goat Hill Tavern* is readily distinguishable from the case before us. In *Goat Hill Tavern*, the CUP was necessary to accommodate a major expansion yet it expired only six

months later. The CUP was thus issued with the understanding that it would be renewed. Here, in contrast, the original CUPs explicitly required ceasing all activity at ATC's facilities and returning the sites to their original condition ten years after the permit was issued if new CUP applications were not timely submitted and ultimately approved.

We find a far better analogue in *Metropolitan Outdoor Advertising Corp. v. City of Santa Ana*, 28 Cal. Rptr. 2d 664 (Cal. Ct. App. 1994). There, a billboard owner sought a CUP to continue operation of a billboard. *Id.* at 665. After the city denied the CUP application, the billboard owner sued the city for a writ of mandate under California Code of Civil Procedure § 1094.5, claiming that it possessed a fundamental vested right in the continued use and maintenance of the billboard. *Id*. The California Court of Appeal rejected this claim because the billboard owner had agreed to be bound by the CUP's terms, including removal of the sign after the CUP's expiration. *Id*. at 666. The court also emphasized that the billboard owner would be required to remove only one of its many signs and that, because the billboard owner had agreed to the CUP's terms, it "knew it would have to remove the billboard." *Id*. The same is true here. ATC agreed to the original CUP's terms, so ATC knew it would have to remove its facilities if it did not renew the CUPs after ten years. Moreover, the Verus, Border, and Mission Valley Facilities are only three of ATC's many telecommunication facilities.

Accordingly, we conclude that ATC does not have a fundamental vested right to the continued use of its facilities, and, as discussed above, substantial evidence in the record supports the City's decision to deny the CUP applications. As a result, the district court properly granted summary judgment

in favor of the City on ATC's California Code of Civil Procedure § 1094.5 claim.

## D.  *The Equal Protection Clause Claim*

ATC contends that the district court erred in applying rational basis scrutiny to its Equal Protection Clause claim because this claim allegedly implicates fundamental First Amendment rights. Alternatively, ATC argues that even if rational basis scrutiny applies, the City's denial of the CUP applications violated the Equal Protection Clause because ATC and the City are similarly situated service providers, and there was no rational basis for treating the two differently.

Municipal decisions like those at issue here "are presumptively constitutional and, therefore, need only be rationally related to a legitimate state interest, unless the distinctive treatment of the party involves either a fundamental right or a suspect classification." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude."). Although the freedom of speech, secured by the First Amendment, certainly qualifies as fundamental, *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940), it is not implicated in this case. ATC does not assert its right to engage in speech. Instead, ATC asserts its right to sell tower space to wireless providers, and this right does not trigger heightened scrutiny. *See Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. 2012). ATC describes in lofty terms the significance of wireless communication in modern American society, but it

has adduced no evidence that the citizens of San Diego will be denied coverage because the City rejected ATC's CUP applications. Consequently, because no fundamental right is at issue, heightened scrutiny is not warranted here.

Applying rational basis scrutiny, we find the City's decision to deny the CUPs unobjectionable. As we have discussed, ATC and the City are not similarly situated service providers. Moreover, even if ATC and the City were similarly situated providers, the City's decision was rationally related to legitimate state interests: minimizing the aesthetic impact of wireless facilities on the community and providing communications services for its various departments at a reduced cost. In view of these legitimate interests, we cannot say that the City's decision to deny the CUPs was irrational. Accordingly, ATC's Equal Protection Clause claim must fail.

## IV.    CONCLUSION

We reverse the district court's grant of summary judgment in favor of ATC on the PSA claim. The CUP applications were not deemed approved because "the public notice required by law" did not "occur" before the City denied them. We affirm the district court's grant of summary judgment in favor of the City on the remaining claims. There was no violation of the TCA. The City evaluated the CUP applications under the proper provision of the Land Development Code and supported its decision to deny them with substantial evidence. The City did not unreasonably discriminate among providers of functionally equivalent services because ATC and the City are not "similarly situated" providers. ATC has failed to show effective prohibition because it has not demonstrated that its proposals were the least intrusive means of filling a significant gap in

coverage. ATC cannot prevail under California Code of Civil Procedure § 1094.5 because it does not have a fundamental vested right to the continued use of the Verus, Border, and Mission Valley Facilities. Finally, there was no violation of the Equal Protection Clause because the City's decision to deny the CUP applications was rationally related to the City's legitimate interest in minimizing the aesthetic impact of wireless facilities and in providing public communications services.

**REVERSED IN PART, AFFIRMED IN PART.**